**Alfred B. STUBBLEFIELD, Plaintiff,**

v.

**The CITY OF JACKSON, MISSISSIPPI; Kane Ditto, Individually and in His Capacity as Mayor of the City of Jackson, Mississippi, Defendants.**

**Civ. A. No. 3:93–CV–279(L)(N).**

United States District Court,
S.D. Mississippi,
Jackson Division.

Dec. 2, 1994.

James G. McIntyre, Jackson, MS, for plaintiff.

Michele M. Purvis, City Prosecutor's Office, Walter H. Boone, Alan Walter Perry, Craig E. Brasfield, Forman, Perry, Watkins & Krutz, Terry Wallace, Office of City Atty., Jackson, MS, Leyser Q. Morris, Jackson Police Dept., Jackson, MS, for defendants.

## MEMORANDUM OPINION AND ORDER

TOM S. LEE, District Judge.

This cause is before the court on the joint motion of defendants City of Jackson, Mississippi (City) and Mayor Kane Ditto for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Also before the court is the separate motion of Mayor Ditto for summary judgment on the basis of qualified immunity. Plaintiff Alfred Stubblefield has responded to both motions and the court, having considered the memoranda of authorities and exhibits submitted by the parties, concludes that Mayor Ditto's motion for summary judgment should be granted and defendants' joint motion should be denied.

Following the resignation of former Jackson Chief of Police David Walker in October 1991, the mayor and City initiated a search for a new chief of police which culminated in the hiring of Jimmy Wilson, a black male, for the position. The plaintiff, Stubblefield, filed this action under 42 U.S.C. §§ 1981 and 1983 of the Civil Rights Act charging reverse racial discrimination in that hiring decision. Stubblefield, a white male, alleges that although he applied for and was qualified for the police chief position, he was not even considered for employment because of his race.

■ Both of the defendants previously moved for dismissal or, alternatively, for summary judgment. By memorandum opinion and order issued January 10, 1994, their motion was denied. In response to defendants' present motions, plaintiff argues initially that res judicata principles apply to bar defendants from again seeking summary judgment. He also argues more generally that as a matter of fairness and judicial economy, defendants should not be permitted to file successive summary judgment motions. Plaintiff's arguments are without merit. While successive summary judgment motions are not always appropriate, it is plainly within the discretion of the district court to allow them. On this subject, the Fifth Circuit has stated:

> While we certainly do not approve in general the piecemeal consideration of successive motions for summary judgment, since the defendants might well normally be held to the requirement that they present their strongest case for summary judgment when the matter is first raised, we do not believe the rules prohibit consideration by a trial court of a second motion of this nature.

*Allstate Finance Corp. v. Zimmerman,* 296 F.2d 797, 799 (5th Cir.1961) (citing Moore's Federal Practice, Vol. IV, p. 2099). More recently, the court has said:

> Successive motions for summary judgment ... are not always aberrational. Courts have found that a subsequent summary judgment motion based on an expanded record is permissible....
>
> The district court ... opted to allow a successive motion for summary judgment. Such a determination, particularly regarding questions of the timing and sequence of motions in the district court, best lies at the district court's discretion.

*Enlow v. Tishomingo County,* 962 F.2d 501, 506–07 (5th Cir.1992); *see also Breeland v. Southern Pacific,* 231 F.2d 576 (9th Cir.1955) (denial of summary judgment motion is not law of the case and has no res judicata

effect). Accordingly, the court may properly consider defendants' motions.

Defendants' motions raise a number of issues for the court's consideration. They argue that (1) Mayor Ditto is entitled to qualified immunity since he reasonably believed that the decision to hire a black police chief amounted to permissible voluntary affirmative action; (2) the plaintiff has failed to adduce sufficient evidence to prove a prima facie case of race discrimination; (3) an exception similar to the Title VII exemption for policy-making employees, 42 U.S.C. § 2000e(f), applies to bar plaintiff's claims under §§ 1981 and 1983; and (4) the Government Employee Rights Act of 1991, 2 U.S.C. § 1201 et seq., provides plaintiff's exclusive remedies and precludes plaintiff's action under §§ 1981 and 1983. Each of these arguments will be addressed. First, however, some of the basic, undisputed facts should be noted.

After the resignation of former Jackson Police Chief David Walker, the mayor and City decided to use the services of Policy Executive Research Forum (PERF), a self-described "national organization of police executives," to help find a replacement for Walker. PERF developed a list of "ideal attributes" to be sought in applicants for the position, and devised a search plan to facilitate a nationwide search for candidates. None of the PERF criteria, or listing of "attributes," indicated that candidates of any particular race were desired.[1] Mayor Ditto, however, during the time PERF was conducting its search, publicly expressed a preference for hiring a black police chief, both in a press release and in a speech before the City Council. Ultimately, Jimmy Wilson was hired for the position.

## I. QUALIFIED IMMUNITY

Mayor Ditto insists that he is entitled to qualified immunity since he reasonably believed that his choice of Wilson as the City's chief of police was permissible voluntary affirmative action. For the reasons that follow, the court concludes that the mayor's motion is well taken and should be granted.[2]

Ditto has presented evidence that in 1974, the City and several of its departments, in response to various lawsuits charging racial discrimination, entered into three separate affirmative action consent decrees, one covering the City as a whole, one with respect to the Jackson Fire Department, and another concerning the Jackson Police Department (JPD), each of which was intended to remedy the effects of past discrimination and increase the distribution of black employees for the City and its departments.[3] The consent agreement applicable to the JPD provided:

> Defendants shall affirmatively use their best efforts to increase the black distribution rate in the job classifications in which black persons are statistically underrepresented, and to employ black persons in job classifications and/or divisions, department[s], and bureaus in which no black person has ever been employed and/or in which no black persons are currently employed as of the date of this Decree.

The decree further stated:

> Subject to the availability of qualified black candidates, defendants shall make future

---

1. PERF's list of attributes did reference a need for "[s]ignificant experience and sensitivity toward interacting with an ethnically and racially diverse community," and "an open, bias free approach to the application of the principle of equal opportunity employment," but nowhere suggested that members of any particular race were more likely to possess these attributes than others.

2. Plaintiff strenuously argues that the court should not consider the qualified immunity issue as it was addressed and denied in the court's earlier opinion. However, although Ditto did previously raise and the court did consider a claim of qualified immunity, the court did not consider any claim of qualified immunity on the

basis of affirmative action. This particular issue has not heretofore been raised.

3. The plaintiffs in Conley v. Jackson Police Dept., No. 73–J–4, filed suit in 1973 under 42 U.S.C. §§ 1981 and 1983 charging that the JPD engaged in racial discrimination against black applicants and employees. Evidence was presented in that case showing that from its formation until 1963, the JPD had employed no black officers, and that at the end of 1972, only 19 out of 302 officers were black. Further, of the 106 police officers in supervisory positions, only 1 was black. In light of these disparities, although not expressly admitting liability, the JPD agreed to adopt a course of affirmative action.

promotions within the Jackson Police Department alternatively [from separately maintained eligibility] list[s] in a one-to-one ratio until the proportion of black persons in supervisory positions and in the ranks above patrolman is substantially equal to the proportion of blacks to whites in the working age population of the City of Jackson.

In support of his motion, Ditto asserts that the City, as evidenced by the consent decree, has been in the process of attempting to remedy the effects of past discrimination through the implementation of this, as well as the other, affirmative action plans, and he states that while the City has made some progress in securing minority representation in its work force, blacks are still underrepresented in positions of authority and leadership. For these reasons, he states, one of his primary goals upon taking office was to increase minority representation in the City's leadership positions, including the position of police chief. Because of these considerations, and also because of his concern over the black community's distrust of the JPD, he determined that a black should be selected to head the department.[4] He further asserts that after Walker's resignation, he likewise determined that in order to demonstrate the City's continuing concern for minority representation and to restore the black community's trust in the JPD, another black should be chosen to replace him.

█ In determining whether Ditto is immune for his actions on the basis of qualified immunity, the question for the court is whether he could "reasonably have ... thought [his actions] to be" permissible in light of the law in effect at the time. *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987); *see also Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986) (qualified immunity covers "all but the plainly incompetent or those who knowingly violate the law."). Unquestionably, it is, and was at the time of the decision to hire Wilson, constitutional for a public employer to "undertake an affirmative action program which is designed to further a legitimate remedial purpose...." *Wygant v. Jackson Board of Educ.*, 476 U.S. 267, 287, 106 S.Ct. 1842, 1854, 90 L.Ed.2d 260 (1986) (O'Conner, J., concurring); *see also Johnson v. Transportation Agency*, 480 U.S. 616, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987) (government employers may participate in affirmative action plans without violating Title VII). However, "the circumstances under which voluntary affirmative action may be legally undertaken by a public employer are not entirely clear." 2 A. Larson & L. Larson, *Employment Discrimination* § 57A.81, at 11–96.284 (1993). That is to say, the parameters of permissible voluntary affirmative action programs are far from being clearly established. As the above-quoted treatise explains,

the best reading of [Supreme Court decisions on the topic] is that voluntary affirmative action by a public employer is permissible under the Constitution.... There probably must be a "compelling governmental interest" to justify such racial classifications. This probably means in turn that a public agency cannot undertake affirmative action merely to remedy the effects of past societal discrimination:

---

4. Ditto expressed these sentiments in an address to the Jackson City Council, reprinted in the *Clarion–Ledger* on November 6, 1991, stating:

I have received numerous phone calls alleging reverse discrimination because of my intentions in hiring the new chief—stating that I am giving in to political pressures to name a black chief.

....

When I became mayor, there was one black city department head and there were no women. In addition, black managers and black professionals had been systematically denied real authority in city government.... [T]his administration has made a sincere effort to appoint black managers and professionals in all departments of city government. This is fair. It is also appropriate.

....

My preference to hire a black law enforcement executive reflects my belief that there are several well-qualified black and white candidates for the position of police chief. And that given the current leadership composition of the police department and other departments of city government, that it is appropriate to seek a black chief at this time.

Naturally, I would prefer to say simply that I want the best person for the job. But in our current world, too often that statement hides a person's preference for one race or another.

there must be at least some indication of past discrimination within the agency in question.

*Id.* Furthermore, the means by which to remedy such past discrimination within the subject agency, i.e., the affirmative action plan, must "not impose disproportionate harm on the interests, or unnecessarily trammel the rights of innocent individuals directly and adversely affected by a plan's racial preference." *Wygant,* 476 U.S. at 287, 106 S.Ct. at 1854.

■ In the court's opinion, Mayor Ditto is entitled to qualified immunity. As the foregoing discussion suggests, the determination of whether a public employer's actions constitute acceptable or unacceptable affirmative action may ultimately be difficult. However, whether Mayor Ditto's actions were, in law and in fact, permissible and lawful affirmative action is not the question before the court; rather, the question for the court is whether he could reasonably have thought they were. Plaintiff argues that Ditto could not have believed his actions to be lawful since the consent decree pursuant to which Ditto claims he acted did not even mention the position of chief of police. He reasons, therefore, that the position was not covered under the affirmative action plan applicable to the JPD and that Ditto's actions were thus clearly inappropriate. In the court's opinion, though, Ditto could reasonably have believed his actions were authorized under the plan. The consent decree directed defendants to use their "best efforts to increase the black distribution rate in job classifications in which black persons are statistically underrepresented and to employ black persons in job classifications and/or divisions, department[s], and bureaus in which no black per-

son has ever been employed." One could certainly reasonably construe this provision as encompassing the police chief position. In summary, therefore, the court finds that Mayor Ditto could reasonably have believed that his preference for hiring a black police chief was within the bounds of the law, in light of a history of racial discrimination within the JPD [5] and in view of the consent decree which mandated preferential hiring and promotion of blacks to remedy the effects of such discrimination. Ditto's motion for summary judgment will, therefore, be granted.

## II. PLAINTIFF'S PRIMA FACIE CASE

■ In their motion for summary judgment, defendants contend that plaintiff's claim should be dismissed since he has failed to establish a prima facie case for employment discrimination under 42 U.S.C. § 1981 or § 1983. In order to establish a case of employment discrimination, a plaintiff must demonstrate that (1) he was a member of a protected group,[6] (2) he applied for and was qualified for the position, (3) despite his qualifications he was rejected, and (4) the position was filled by someone from a group other than plaintiff's. *See Merwine v. Board of Trustees for State Institutions,* 754 F.2d 631 (5th Cir.1985); *see also Baldwin v. Birmingham Bd. of Educ.,* 648 F.2d 950 (5th Cir.1981).[7] Defendants contend that plaintiff cannot show that he was qualified for the job of police chief, and argue, more specifically, that plaintiff failed to meet two specific requirements for the position.[8] They submit that in accordance with the PERF criteria, applicants were required to have received a baccalaureate degree from an accredited

---

**5.** *See supra* note 3.

**6.** The Supreme Court has held that whites, as any other racial group, are entitled to the protection of the Civil Rights discrimination laws. *See McDonald v. Santa Fe Transp. Co.,* 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976); *Chaiffetz v. Robertson Research Holding, Ltd.,* 798 F.2d 731, 735 (5th Cir.1986).

**7.** The standards of proof which are employed in cases brought under Title VII also apply to employment actions brought under §§ 1981 and 1983. *Adams v. McDougal,* 695 F.2d 104, 109

(5th Cir.1983); *Baldwin v. Birmingham Bd. of Educ.,* 648 F.2d 950, 951 (5th Cir.1981).

**8.** In their previous motion, defendants sought summary judgment on the basis that plaintiff could not show that he had even applied for the position. The court, however, concluded that there was a genuine issue of material fact as to whether he had made application for the job. For purposes of this motion, however, the court will assume that he filed a timely application with the City's personnel office.

school in police administration, criminal justice, police public administration, or related fields, and were required to have successful experience in progressively responsible supervisory, administrative and managerial assignments in policing. The evidence of record shows that Stubblefield, at the time that he applied for the position of chief of police in 1992, had not received a baccalaureate degree in any field, although he had completed all of the necessary course work toward a degree and was merely awaiting the issuance of his diploma. His degree, though, was not in a field related to police administration, as his education had consisted primarily of religion and psychology courses. While this fact might otherwise undermine the potential for reasonably finding that Stubblefield possessed the requisite qualifications for the job, the court has before it an affidavit from Mayor Ditto in which he states that he would consider relaxing the degree requirement if there was an otherwise highly qualified applicant, such as an officer "with years experience in managing and supervising a major police force." [9]

Defendants assert that even if Stubblefield's lack of a degree in the correct field did not disqualify him from consideration for the position, he still lacked the necessary qualifications since he did not have the requisite experience. In this vein, they point out that while Stubblefield had served on the Jackson police force for twenty years, he never rose above the rank of detective, an entry-level position, and had little or no managerial experience. Defendants acknowledge that in addition to his civilian police experience, Stubblefield had attained the rank of Colonel in the United States Army's Military Police and acknowledge, apparently, that he may have had some level of managerial and administrative experience in that capacity. They assert, though, that the job criteria for the police chief position specified civilian police managerial and administrative experience, and insist that in any event, military police experience is not comparable to civilian police experience.

The court has considered defendants' arguments and the evidence presented with respect to this issue and concludes that there are genuine issues of material fact as to whether plaintiff was qualified for the position at issue, including, for instance, whether leadership in the military police would be substantially equivalent to the types of responsibilities in an urban police department and whether his degree, which was not in "criminal justice or a related field," would qualify him for the job.[10] Thus, the issue of plaintiff's qualification is reserved for consideration at trial.

## III. EXCEPTION FOR POLICY-MAKING EMPLOYEES

42 U.S.C. § 2000e(f) excludes from the definition of "employee" for Title VII purposes,

> any person elected to public office in any State or political subdivision of any State by the qualified voters thereof, or any person chosen by such officer to be on such officer's personal staff, or an appointee on the policy making level or an immediate advisor with respect to the exercise of the constitutional or legal powers of the office. The exemption set forth in the preceding sentence shall not include employees subject to the civil service laws of a State government, governmental agency or political subdivision.

9. The court would note, too, that the fact that the degree "requirement" could be waived indicates that it was not so much a requirement as it was a consideration in the selection process.

10. Defendants argue that "equivalency" will not suffice where job qualifications are unambiguous, citing *Merwine v. Board of Trustees for State Institutions of Higher Learning,* 754 F.2d 631, 637 (5th Cir.1985). The court finds that the "qualifications" articulated by both PERF and the mayor were, in fact, ambiguous, especially in light of Mayor Ditto's statement that he would

consider relaxing the degree requirement if there was an otherwise qualified applicant with "years experience in managing and supervising a major police force." Further, the court would note that PERF's "ideal attributes" listed supervisory, managerial and administrative assignments in "policing," not in "civilian policing." Finally, the document setting forth the qualification criteria developed by PERF identifies approximately 25 "ideal attributes," but says nothing about these "attributes" being mandatory qualifications for the position.

Defendants argue that the City's police chief qualifies as a policy making appointee or immediate advisor to an elected official within this Title VII exemption, and urge the court to recognize a similar exemption for §§ 1981 and 1983. Even were the court to assume that the chief of police is a policy making appointee or an immediate advisor to the mayor so as to fall within the Title VII exemption, however, the court is persuaded that such an exemption should not be recognized with respect to § 1981 or § 1983. The courts have repeatedly made clear that while Title VII and §§ 1981 and 1983 do overlap, they are separate laws, and conduct creating liability under one may not create liability under the other. *See, e.g., Johnston v. Harris County Flood Control Dist.,* 869 F.2d 1565, 1574–75 (5th Cir.1989). And so far as the court has been able to discern, no reported case has recognized an exemption under § 1981 or 1983 similar to that of 42 U.S.C. § 2000e(f). In fact, those few courts which have considered the issue have declined to do so. *See Cronovich v. Dunn,* 573 F.Supp. 1340, 1344–45 (E.D.Mich.1983) (Title VII exemption for policy making positions does not carry over to § 1983); *Allen v. City of Yonkers,* 803 F.Supp. 679, 702 n. 29 (S.D.N.Y. 1992); *cf. Adams v. McDougal,* 695 F.2d 104, 107 (5th Cir.1983) (rejecting notion that appointee of elected official was precluded from bringing discrimination action under § 1981, reasoning that Fourteenth Amendment "protects an appointee from discrimination on the basis of race."); *Ramirez v. San Mateo County District Attorney's Office,* 639 F.2d 509 (9th Cir.1981) (actions under §§ 1981 and § 1983 by appointee allowed even if not permitted under § 2000e(f)). This court likewise declines to read such an exemption into § 1981 or § 1983.

## IV. GOVERNMENT EMPLOYEE RIGHTS ACT OF 1991

Defendants next argue that plaintiff's claim is governed by the Government Employee Rights Act of 1991, 2 U.S.C. § 1201 et seq., which provides his exclusive remedy, and that since plaintiff failed to comply with the administrative requirements for proceeding under the Act, he is precluded from any recovery in this suit. The Government Employee Rights Act appears to have been primarily intended to give protection against employment discrimination to Senate employees, who were excepted from Title VII's coverage, by providing a set of enforcement procedures and remedies similar to those found in Title VII.[11] However, the Act also serves to effectively "fill in" the Title VII coverage denied state and local government elected officials, their personal staff members, policy making appointees and immediate advisors by virtue of 42 U.S.C. § 2000e(f), addressed *supra.* The Act provides:

§ 1220. Coverage of previously exempt State employees

(a) Application

The rights, protections, and remedies provided pursuant to section 1202 and 1207(h) of this title shall apply with respect to employment of any individual chosen or appointed by a person elected to public office in any State or political subdivision of any State by the qualified voters thereof—

(1) to be a member of the elected official's personal staff;

(2) to serve the elected official on the policy making level; or

(3) to serve the elected official as an immediate advisor with respect to the exercise of constitutional or legal powers of the office.

The Act provides that discrimination on the basis of, *inter alia,* race is not permitted with regard to those persons to whom it applies. And for its violation, the Act entitles victims of discrimination to such remedies as are available under Title VII or to which they would be entitled under 42 U.S.C. § 1981.

11. The introductory section of the Act offers the following definition:
    The term "Senate employee" or "employee" means—
    (A) any employee whose pay is disbursed by the Secretary of the Senate;

    (B) any employee of the Architect of the Capitol who is assigned to the Senate Restaurants or to the Superintendent of the Senate Office Buildings.

Further, the Act provides enforcement mechanisms similar to that of Title VII as, for example, filing a claim of discrimination with the Equal Employment Opportunity Commission.[12] In their motion, defendants argue that the Government Employee Rights Act applies to the position of the City's police chief.[13] They then reason that since the Act provides the same remedies that are available under §§ 1981 and 1983 and since it further establishes an elaborate enforcement mechanism for its violation, then it stands to reason that Congress did not intend that employees within the Act's coverage be allowed simply to bypass the carefully crafted remedies of the Act by filing an original action under § 1981 and/or § 1983. In the court's opinion, defendants' position is without merit.

Though there are no reported cases addressing the relevant provisions of the Act, the substantive provisions of the Government Employee Rights Act are quite similar to Title VII. In the court's opinion, therefore, the abundance of authority addressing the interplay between Title VII and §§ 1981 and 1983 applies by analogy to the issue raised by defendants. It is well established that Title VII and §§ 1981 and 1983 are concurrent remedies for discrimination. In *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975), the Supreme Court ruled that Title VII did not preclude recovery under § 1981. The Court noted that the legislative history of Title VII manifested an intent to "allow an individual to pursue independently his right under both Title VII and other applicable state and federal statutes." *Johnson*, 421 U.S. at 459, 95 S.Ct. at 1719. The Court pointed out that Congress had noted that the remedies under § 1981 and Title VII were not mutually exclusive, and had specifically rejected an amendment which would not

have allowed suit under § 1981. *Id.* The remedies, the Court concluded, were "separate, distinct, and independent." *Id.* at 461, 95 S.Ct. at 1721. The Fifth Circuit has similarly concluded, in light of *Johnson* and other pertinent authorities, that Title VII does not preclude relief under § 1983. The court explained in *Johnston v. Harris County Flood Control District*, 869 F.2d 1565 (5th Cir.1989), that while "Title VII *is* the exclusive remedy for a violation of its own terms[,] . . . when a public employer's conduct violates both Title VII and a separate constitutional or statutory right, the injured employee may pursue a remedy under § 1983 as well as under Title VII." *Johnston*, 869 F.2d at 1573.

In the court's opinion, just as Title VII is not the exclusive avenue of redress for a violation of one's right to be free from unlawful employment discrimination based on race, neither is the Government Employee Rights Act the exclusive remedy for the plaintiff in this case. He is entitled to proceed under §§ 1981 and 1983.

## V. CONCLUSION

Based on the foregoing, it is ordered that defendants' joint motion for summary judgment is denied. It is further ordered, however, that Mayor Ditto's separate motion for summary judgment is granted.

---

**12.** The Act states:
(b) Enforcement by administrative action
(1) In general
Any individual referred to in subsection (a) of this section may file a complaint alleging a violation, not later than 180 days after the Equal Employment Opportunity Commission, which . . . shall determine whether a violation has occurred and shall set forth its determination in a final order. If the Equal Employment Opportunity Commission determines that a violation has occurred, the final order shall also provide appropriate relief. 2 U.S.C. § 1220(b). The EEOC has yet to publish its regulations and procedures for use under § 1220.

**13.** This is simply the inverse of their argument that the police chief position is exempted from the coverage of Title VII.