Walter J. POWELL, Plaintiff

v.

CITY OF PITTSFIELD; Edward Reilly; Gerald Lee; Kathleen Alexander; and Gordon Bird, Defendants

No. CIV.A. 97–30189–MAP.

United States District Court,
D. Massachusetts.

April 23, 2001.

David P. Hoose, Howard S. Sasson, Katz, Sasson & Hoose, Springfield, MA, for Walter J. Powell, Plaintiff.

Katherine G. Alexander, City Solicitor's Office, Pittsfield, MA, Judith C. Knight, Campoli & Curley, Pittsfield, MA, for City of Pittsfield.

Katherine G. Alexander, City Solicitor's Office, Pittsfield, MA, Judith C. Knight, Campoli & Curley, Pittsfield, MA, Daniel R. Solin, Pittsfield, MA, for Edward Rielly.

David B. Mongue, Donovan & O'Connor, Adams, MA, Katherine G. Alexander, City Solicitor's Office, Pittsfield, MA, Judith C. Knight, Campoli & Curley, Pittsfield, MA, for Gerald Lee.

Nancy Frankel Pelletier, Robinson, Donovan, Madden & Barry, Springfield, MA, Katherine G. Alexander, City Solicitor's Office, Pittsfield, MA, Judith C. Knight, Campoli & Curley, Pittsfield, MA, for Kathleen Alexander.

John A. Agostini, Pittsfield, MA, Katherine G. Alexander, City Solicitor's Office, Pittsfield, MA, Judith C. Knight, Campoli & Curley, Pittsfield, MA, for Gordon Bird, Defendants.

### ORDER

PONSOR, District Judge.

Upon *de novo* review this Report and Recommendation is hereby adopted, without opposition. Rulings on the pending motions for summary judgment are as set forth in Section IV. The clerk will set the matter for a status conference.

So ordered.

*REPORT AND RECOMMENDATION WITH REGARD TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (Docket Nos. 46, 49, 56, 57 and 61 )*

NEIMAN, United States Magistrate Judge.

Walter J. Powell ("Plaintiff"), believing that the City of Pittsfield ("Pittsfield") did not rehire him as a police officer quickly enough following his settlement of a prior employment discrimination lawsuit, filed this action on September 8, 1997. Plaintiff claims that Pittsfield, along with four individuals involved in the rehiring process, Mayor Edward Reilly ("Reilly"), Police Chief Gerald Lee ("Lee"), City Solicitor Kathleen Alexander ("Alexander") and City Physician Gordon Bird ("Dr.Bird") (collectively "Defendants"), violated certain civil rights and other laws.

Defendants have each moved for summary judgment. The motions, five in all, have been referred to this court for a report and recommendation. *See* 28 U.S.C. § 636(b). For the reasons stated below, the court will recommend that two of the motions, Dr. Bird's and Lee's, be allowed in full and that the remaining three, Pittsfield's, Reilly's and Alexander's, be allowed in part and denied in part.

## I. SUMMARY JUDGMENT STANDARD

A court may grant summary judgment pursuant to FED. R. CIV. P. 56(c) if "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Once the moving party has asserted that no genuine issue of material fact exists, the burden is on the opposing party to point to specific facts demonstrating that there is, indeed, a trialworthy issue. *National Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir.1995). A "genuine" issue is one "that a reasonable jury could resolve . . . in favor of the nonmoving party." *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir.1995). *Accord United States v. One Parcel of Real Property, Great Harbor Neck, New Shoreham, R.I.*, 960 F.2d 200, 204 (1st Cir.1992).

Not every genuine factual conflict, however, necessitates a trial. " 'It is only when a disputed fact has the potential to change the outcome of the suit under the governing law if found favorably to the nonmovant that the materiality hurdle is cleared.' " *Parrilla–Burgos v. Hernandez–Rivera*, 108 F.3d 445, 448 (1st Cir. 1997) (quoting *Martinez v. Colon*, 54 F.3d 980, 983–84 (1st Cir.1995)). At bottom, matters of law are for the court to decide at summary judgment. *Blackie v. Maine*, 75 F.3d 716, 721 (1st Cir.1996).

## II. BACKGROUND

The court states the facts, which span nearly two decades, in a light most favorable to Plaintiff, the non-moving party. In doing so, the court deems admitted uncon-

troverted facts of record supplied by Defendants. *See* Local Rule 56.1.[1]

Plaintiff, an African–American, attended the state police academy in 1983 and thereafter began working as a police officer in the city of North Adams. (Plaintiff's Amended Affidavit (attached to Docket No. 78) ¶¶ 1, 2.) In May of 1985, Plaintiff was hired as a Pittsfield police officer. (Docket No. 32: First Amended Complaint and Demand for Jury Trial ("Complaint") ¶ 9.) When Plaintiff was initially hired by Pittsfield, Dr. Bird performed a routine physical examination. (Docket No. 71: Exhibits in Support of Plaintiff Opposition to Defendants' Motions for Summary Judgment ("Plaintiff's Exhibits"), Exhibit 5 (Bird Deposition) at 15–16.) At all relevant times, Dr. Bird held the title of City Physician, a part-time, contract position. (Complaint § 1(C)(4), at 3 and § II at 4.)

On March 21, 1991, Plaintiff was fired from the Pittsfield Police Department. (Complaint ¶ 10.) Plaintiff thereafter filed a lawsuit in this district alleging illegal race discrimination. *See Powell v. Pittsfield,* Civil Action No. 91–30195–FHF. While that lawsuit was pending in 1992, Reilly became the Mayor of Pittsfield, Alexander became the City Solicitor and Lee became the Chief of Police. (See Pittsfield's Facts §§ i(C)(1)-(3), at 2–3.) Reilly, as Mayor, was the ultimate appointing authority for the Police Department. (Plaintiff's Exhibits, Exhibit 2 (Reilly Deposition) at 8.)

On September 29, 1993, Plaintiff and Pittsfield entered into a Settlement Agreement and Release of All Claims ("Settlement Agreement"). (Complaint ¶ 12.) Reilly and Alexander negotiated the Settlement Agreement on behalf of Pittsfield. (Plaintiff's Exhibits, Exhibit 2 (Reilly Deposition) at 13.) As part of their negotiation, Reilly and Alexander met with Lee to discuss requirements which would allow Plaintiff to be reinstated. (*Id.,* Exhibit 4 (Lee Deposition) at 23–24.) Reilly, however, viewed himself as the person ultimately responsible for Plaintiff's reinstatement.

1. Although the motions have been ably briefed and argued by all parties, the court, in sketching the facts, has been slowed by a number of technical deficiencies. Particularly frustrating was the fact that *arguments* had been inserted in various parties' Local Rule 56.1 *factual* statements. In addition, in accord with Local Rule 56.1, the court has had to ignore proffered "facts" that contain no record citation.

One example is Reilly's 56.1 Statement (contained in Docket No. 64: Reilly's Memorandum of Law in Support of his Motion for Summary Judgment ("Reilly's Brief")). Reilly states therein that "from [September 29, 1993] until late February, 1996, [he] had no direct communication with the Plaintiff," citing, as support, his affidavit dated April 28, 2000. (Reilly's Brief at 7 ¶ 8.) The affidavit, however, says nothing of the sort, (see *id.,* Exhibit A), and, accordingly, the court has ignored this particular allegation.

By way of further example, at page 10 of its Local Rule 56.1 Statement of Facts (Docket No. 58) ("Pittsfield's Facts"), Pittsfield *argues,* without record support, that a business Plaintiff ran "was in violation of [a] City Ordinance and a conflict of interest." Similarly, Pittsfield then states in the next sentence, again without any record support, that Plaintiff was "informed ... that [he] would have to turn in his [business] licenses." (*Id.*) These unsupported proffers have been disregarded.

For his part, Plaintiff claims at paragraphs dd through ff of his Local Rule 56.1 Statement of Facts in Dispute in Support of his Opposition to the Defendants' Motion(s) for Summary Judgment (Docket No. 61) ("Plaintiff's Facts") that notes taken on November 10, 1993, indicate that Alexander, Reilly, Lee and Bird discussed whether Plaintiff was suffering from a "disabling condition" and whether they were entitled under the law to have him "retire" or "let him go." Because the actual notes contain no such indication, Plaintiff's description has been ignored by the court.

(*Id.*, Exhibit 2 (Reilly Deposition) at 35–36.)

The terms of the Settlement Agreement required Plaintiff to dismiss with prejudice all civil actions pending against Pittsfield, its agents, employees, successors and assigns, including the prior action filed in this court. (Docket No. 60: Exhibits [to Pittsfield's] Concise Statement of Facts ("Pittsfield's Exhibits"), Exhibit B ¶ 4.) In return, Pittsfield agreed to pay Plaintiff $81,000 and reinstate him as a police officer. (*Id.* ¶ 1.) Plaintiff's reinstatement, however, was conditioned upon his passing a physical and psychological examination and other reasonable conditions to be determined by Police Chief Lee. (*Id.* ¶ 3.) More specifically, the Settlement Agreement, in applicable part, provided as follows:

> Powell agrees that his reinstatement shall be conditioned upon his successful completion of certain re-training as determined by Chief of Police Gerald Lee, certain psychological counseling if and as determined by Chief Lee, successfully undergoing a complete physical and psychological examination, and whatever other conditions Chief Lee determines are necessary in order to facilitate Mr. Powell's reorientation into the Department for both his own interests and the best interests of the Department.

(*Id.*)

Following execution of the Settlement Agreement, Pittsfield's personnel department requested Dr. Bird to provide a full police academy entrance physical exam to Plaintiff. (Complaint ¶ 17; Docket No. 48: Exhibits Regarding Memorandum in Support of Bird's Motion for Summary Judg-

ment ("Bird's Exhibits"), Exhibit 8 (Bird Deposition) at 31.) At the time, Dr. Bird's duties as City Physician included giving physicals to Pittsfield police officer candidates who were entering the Pittsfield police force. (Complaint ¶ 16.) Because Pittsfield did not have a specific custom or policy in place pertaining to the rehiring or reinstatement of police officers after a period of separation, the city utilized its policy requiring that newly hired police officers pass a physical examination administered by Dr. Bird. (See Docket No. 65: Memorandum in Support of Alexander's Motion for Summary Judgment ("Alexander's Brief"), Exhibit 2 (Alexander Deposition) at 17–19.)

Dr. Bird examined Plaintiff on October 20, 1993—lab tests appeared to have been taken on October 13, 1993 (Bird's Exhibits, Exhibit 9)—and Dr. Bird found Plaintiff healthy and "[q]ualified for the position sought." (Complaint ¶¶ 18, 19; Pittsfield's Exhibits, Exhibit D.) Nonetheless, abnormal liver function tests, which indicated a possible mild dysfunction, required further liver testing. (Pittsfield's Exhibits, Exhibit D; Complaint ¶ 19.)

On the basis of these further tests, taken on or about October 27, 1993, Dr. Bird determined that Plaintiff, while otherwise healthy, should have a hepatitis panel test to further assess liver function. (Complaint ¶ 20.) On November 10, 1993, the test indicated a positive reaction for hepatitis C. (*Id.* ¶ 21; Pittsfield's Exhibits, Exhibit E.) Accordingly, Plaintiff was referred to a specialist, although he indicated that he also wanted to arrange for a consultation with his own doctor about the possibility of hepatitis C. (Complaint ¶ 21; Bird's Exhibits, Exhibit 13.) [2]

---

**2.** At his deposition, Dr. Bird stated that, unlike hepatitis A and B, "[h]epatitis C is a major concern" because of its connection to cirrhosis and liver cancer:

> Hepatitis A and B have been identified through blood work for many years. There are serologies available to diagnose the difference. A, B and C represent different

On November 15, 1993, Dr. Robert Taylor—a doctor chosen by Plaintiff—reported to Dr. Bird that, although Plaintiff may have a hepatitis infection, he was otherwise healthy and was only restricted from giving blood and imbibing alcohol. (Alexander's Brief, Exhibit 4(F).) Plaintiff then saw Dr. Arthur Wasser, a gastroenterologist to whom he was referred by Dr. Bird. (Pittsfield's Exhibits, Exhibit F.) Dr. Wasser reported on December 13, 1993, that Plaintiff probably had hepatitis C and that treatment for this disease could involve a six month course of interferon three times a week with attendant side effects. (*Id.*) Even so, Dr. Wasser opined that Plaintiff was asymptomatic and otherwise "a healthy, strapping man" and that the risk of transmission to co-workers and others was "rather low." (*Id.*)

In the meantime, on December 1, 1993, Plaintiff applied for and was granted a license to run a taxi and limousine business by the Pittsfield License Board. (*Id.* Exhibit R.) Plaintiff avers that he began driving limousines at the time to help support his family. (Plaintiff's Amended Affidavit ¶ 11.)

On December 21, 1993, Dr. Bird sent a report to Pittsfield's personnel department indicating that Plaintiff had "chronic active hepatitis" and was, therefore, "disquali-

fied" from employment. (Complaint ¶ 24; Pittsfield's Exhibits, Exhibit I.) Upon learning of Dr. Bird's December 21, 1993, letter, Alexander, City Solicitor, spoke to Plaintiff's then counsel, Michael Powers ("Powers"), and advised him that, regardless of Dr. Bird's medical opinion, Plaintiff was not legally disqualified from employment. (Alexander's Brief, Exhibit 2 (Alexander Deposition) at 85.) Plaintiff fired Powers in January of 1994. (*Id.*, Exhibit 5 (Powell Deposition) at 215.)

On February 15, 1994, Plaintiff's new counsel; Kenneth Gogel ("Gogel") wrote Alexander demanding either reinstatement or an official "disqualification" so that Plaintiff could commence appellate review of the matter. (Plaintiff's Exhibits, Exhibit 22.) In letters to Gogel dated February 22 and March 30, 1994, Alexander confirmed that Pittsfield was not yet legally disqualifying Plaintiff, but that the city wanted more medical information from him. (Alexander's Brief, Exhibit 4(J) and (N).) Ultimately, Plaintiff arranged for a liver biopsy to be performed by Dr. F. Borhan–Manesh of the Veterans Administration. (See *id.*, Exhibit 4(O).) Plaintiff confirmed at his deposition that his doctors told him "that it was medically impossible to make [a definite hepatitis C] diagnosis"

types of viruses that attack the liver. Hepatitis A is the traditional one that used to be felt contaminated through food, water, by a fecal oral root where a person would become acutely ill with jaundice, nausea, vomiting and fully recover. And long term complications are either nonexistent or rare.

Hepatitis B was the traditional one transmitted through blood and blood products, can cause an acute illness as well as a chronic illness.

Hepatitis C was the one we used to call nonA nonB until 1989, was felt to be a hepatitis transmitted through blood products and transfusions. But since 1989 had a blood test that could identify it. It also is

an inflammatory condition of the liver and unfortunately people that contract it, eighty-five percent or so will always have it in their system. Only fifteen percent probably clear it and have unmeasurable virus later on.

Hepatitis C is a major concern to the individual that has it because of the incidents over the years with the development of cirrhosis and subsequent liver cancer. There are treatments available although they are not very good ones, as far as treatment of hepatitis C to try to improve an individual's prognosis. [Sic]

(Bird's Exhibits, Exhibit 1 (Bird Deposition) at 58–60.)

without a liver biopsy. (Bird's Exhibits, Exhibit 16 (Powell Deposition) at 50.)[3]

On May 3, 1994, Dr. Borhan–Manesh, having completed the liver biopsy, issued his report. Dr. Borhan–Manesh's report indicated that, although Plaintiff had chronic hepatitis C, he was otherwise healthy and fit for his job and that there was no risk of infection from casual contact. (Complaint ¶ 25; Pittsfield's Exhibits, Exhibit L.) Thereafter, several things happened.

First, on May 6, 1994, Gogel wrote Alexander demanding immediate reinstatement based on Dr. Borhan–Manesh's report. (Plaintiff's Exhibits, Exhibit 25.) At about the same time, Plaintiff applied for and received a bank loan to operate his taxi and limousine business and inquired of Lee, the police chief, as to whether he would be able to obtain a "disability" pension if he was unable to return to his job as a police officer. (See Pittsfield's Exhibits, Exhibit T; Alexander's Brief, Exhibit 2 (Alexander Deposition) at 121–23, 147–49, Exhibit 3 (Lee Deposition) at 52, 65–66; Plaintiff's Amended Affidavit ¶ 11.) In the meantime, Alexander and Dr. Bird, independently, researched the legal and medical ramifications of hepatitis C and the Americans With Disabilities Act ("ADA"). (Alexander's Brief, Exhibit 2 (Alexander Deposition) at 30–31, 38–40, Exhibit 3 (Lee Deposition) at 53–56.) In addition, Alexander and Lee discussed whether Plaintiff had a "communicable disease." (Plaintiff's Exhibits, Exhibit 26.)

On May 11, 1994, Alexander, Reilly and Lee met to discuss Plaintiff's situation. (See Plaintiff's Exhibits, Exhibit 27.) Alexander's note from that meeting refers to "results of biopsy," "enforcing [the] ADA" and the "2 job rule" as well as Plaintiff's anticipated return to work (*Id.*) The bottom of the note states: "write Gogel asking for full release of all records." (*Id.*)

On May 12, 1994, Alexander did indeed write Gogel and advised him that Reilly and Lee were willing to consider Dr. Borhan–Manesh's results and that, in consultation, they would make a determination regarding reinstatement. (*Id.*, Exhibit 28.) The letter also indicated that Pittsfield remained concerned about the risk to the public and other police officers from Plaintiff's condition. (*Id.*) The next day, Alexander was provided with Plaintiff's release authorizing Defendants to discuss his condition with Dr. Borhan–Manesh. (*Id.*, Exhibit 29.) Alexander forwarded the release to Dr. Bird. (*Id.*, Exhibit 30.)

In June of 1994, Dr. Bird, concerned that Plaintiff's employment as a police officer could entail a higher than normal risk of blood to blood contact, consulted with public health officials at the U.S. Center for Disease Control and the University of Massachusetts Medical Center. (Complaint ¶ 26; Pittsfield's Exhibits, Exhibit N.) In a letter dated June 28, 1994, these officials informed Dr. Bird that they knew of no restrictions preventing police officers with hepatitis C, who were otherwise healthy, from performing their duties. (Bird's Exhibits, Exhibit 23; see also Complaint ¶ 26; Pittsfield's Exhibits, Exhibit N.) Dr. Bird apparently shared this information with Reilly and Alexander. (See Plaintiff's Exhibits, Exhibit 31.)

**3.** It should be noted, however, that, on December 21, 1993, Plaintiff was examined by Dr. Veronica DeYeso, a gastroenterologist practicing in Great Barrington, who concluded that, although infectivity was probably less than one percent, Plaintiff "must have a liver biopsy." (Bird's Exhibits, Exhibit 19.) Plaintiff then saw Dr. Mark Gilbert, a Veterans Administration physician, who confirmed positive test results and that hepatitis C can only be definitively diagnosed by a liver biopsy. (*Id.*, Exhibit 20.)

As it turns out, an attorney sharing office space with Gogel wrote Alexander at about the same time claiming that Pittsfield had breached the Settlement Agreement through its "silence." (Alexander's Brief, Exhibit 4(Q).) Alexander immediately responded in a letter to Gogel dated June 30, 1994, that any delays were solely attributable to Plaintiff. (*Id.*, Exhibit 4(R).)

On July 5, 1994, Dr. Bird sent a letter to Alexander indicating that he no longer thought Plaintiff's condition would medically "disqualify" him from employment. (Complaint ¶ 27; Pittsfield's Exhibits, Exhibit N.) Until the present litigation, however, Plaintiff was not privy to this letter or its contents. (Complaint ¶ 28.) Nor does it appear that Lee or Pittsfield's personnel department were sent copies of Dr. Bird's letter. (See Plaintiff's Exhibits, Exhibit 4 (Lee Deposition) at 70–71, Exhibit 5 (Bird Deposition) at 107.) Instead, Alexander, in response to the letter, indicated to Dr. Bird "that she wanted to keep [the July 5, 1994] report for the time being confidential and that she had concerns that [Plaintiff] was pursuing disability." (Plaintiff's Exhibits, Exhibit 5 (Bird Deposition) at 109.) The concealment of the July 5, 1994 letter, Plaintiff claims, is a "smoking gun."

On July 13, 1994, Alexander and Gogel discussed Plaintiff's consideration of disability benefits. (Alexander's Brief, Exhibit 4(T) (Alexander Affidavit) ¶ 15.) Alexander advised Gogel that, if Plaintiff intended to pursue a disability claim, he should do so before Dr. Bird "made a decision on [Plaintiff]'s qualification for duty" as an adverse decision might not be consistent with Plaintiff's objectives. (*Id.*) Alexander indicated that Pittsfield would offer any assistance it could and Gogel advised her that he would get back to her. (*Id.;* see also Plaintiff's Exhibits,

Exhibit 37.) Alexander did not, however, tell Gogel that Dr. Bird had changed his mind. (Plaintiff's Exhibits, Exhibit 10 (Alexander Deposition) at 149.)

On July 25, 1994, Alexander, having not heard back from Gogel, wrote to him again requesting that he update her on the status of the matter. (Alexander's Brief, Exhibit 4(T) (Alexander Affidavit) ¶ 16.) On July 27, 1994, Gogel called Alexander and told her that his reinstatement request should be put "on hold" since Plaintiff intended to apply for disability retirement benefits. (*Id.* ¶ 17.) Indeed, on July 28, 1994, Plaintiff contacted Dr. Bird about the possibility of pursuing disability retirement options because, he believed, Pittsfield felt he was legally disqualified from employment. (Complaint ¶ 29.) Dr. Bird did not, however, indicate to Plaintiff his belief that Plaintiff was not medically disabled. (See Plaintiff's Exhibits, Exhibit 5 (Bird Deposition) at 114–15, Exhibit 44.)

On September 6, 1994, Alexander wrote Gogel requesting an update. (Alexander's Brief, Exhibit 4(U).) Two days later, on September 8, 1994, Gogel wrote back seeking assistance in the form of information with regard to Pittsfield's retirement law. (*Id.*, Exhibit 4(V).)

On September 20 and October 17, 1994, Alexander wrote additional letters to Gogel indicating that she was not "sure how [Pittsfield could] assist" Plaintiff with his disability application but that he "certainly has [their] cooperation." (Pittsfield's Exhibits, Exhibits 0 and P.) In a file note dated November 14, 1994, Alexander indicated that Plaintiff came in to see Dr. Bird the previous Friday, that Plaintiff wanted Dr. Bird to complete a disability statement, and that Plaintiff's doctors would not say that he was "disabled." (Plaintiff's Exhibits, Exhibit 62.) The note goes on to state that Alexander conversed with Reilly who told her to "talk to Gogel about [Plain-

tiff] finding a [doctor] who will say what he wants!" and then states "great solution!" (*Id.*)

On November 22, 1994, Alexander, who had yet to hear from Gogel, reminded him in a letter, copied to Reilly, that if Plaintiff intended to continue with his claim for disability benefits, he should provide an appropriate statement from his treating physician. (Pittsfield's Exhibits, Exhibit M.) Alexander also reiterated to Gogel that Pittsfield "had requested [Dr. Bird] hold off on his report to the City until after the possibility of a disability retirement was fully explored by [Plaintiff]." (*Id.*) [4]

Hearing nothing, Alexander again wrote Gogel on December 27, 1994, asking that he "suggest what the City should do at this point." (*Id.*, Exhibit P.) The next day, Gogel wrote back indicating that Plaintiff might be seeking yet another attorney, prompting Alexander to write Plaintiff directly on January 4, 1995. (*Id.*) Again, none of Alexander's correspondence made reference to Dr. Bird's July 5, 1994 letter.

The sequent correspondence occurred in March of 1995 between Alexander and a Connecticut attorney Plaintiff had just hired, Elton Williams ("Williams"). (*Id.*) As with her prior letters, Alexander's letter to Williams of March 28, 1995—in which she advised Williams that she would be happy to meet with him and discuss Plaintiff's case—said nothing about Dr. Bird's July 5, 1994 opinion that Plaintiff's condition no longer medically "disqualified" him from employment. (See *id.*)

On May 12, 1995, Alexander and Williams met to discuss Plaintiff's unresolved issues. (Alexander's Brief, Exhibit 4(T) (Alexander Affidavit) ¶ 32.) It appears that Alexander informed Plaintiff at that time that he could be reinstated but for the fact that he owned a business—his taxi and limousine venture—in violation of the city ordinance prohibiting police officers from owning businesses or engaging in any outside employment. (Complaint ¶ 31.) In a letter dated May 30, 1995, Williams advised Alexander that Plaintiff indeed intended to pursue reinstatement and asked what conditions needed to be fulfilled prior to his return. (Alexander's Brief, Exhibit 4(GG).)

On June 5, 1995, Alexander wrote Williams, informing him that, before reinstatement, Pittsfield needed responses to two questions: (1) whether Plaintiff had received or was undergoing medical treatment and (2) whether he had divested his interest in the taxi and limousine business. (*Id.*, Exhibit 4(HH).) In posing the latter question, Alexander relied on Lee's opinion that Plaintiff could not be a police officer while operating a taxi business in Pittsfield. (*Id.*, Exhibit 2 (Lee Deposition) at 75.) With respect to this issue, it appears that a number of white police officers who owned businesses or had other employment—e.g., one officer ran a bar in Dalton—had been permitted to remain employees of the police department. (Plaintiff's Amended Affidavit ¶¶ 15, 16; Pittsfield's Exhibits, Exhibit Z (Powell Deposition) at 287–88; Complaint ¶ 32.) Lee explained at his deposition, however, that Plaintiff's business was different since that business presented a potential conflict of interest; the Police Department was an agent of the License Board which had

---

4. In the meantime, Plaintiff went to the Baystate Medical Center where he indicated to doctors that he had received "conflicting reports from [two] other physicians about whether he has or has had or has been exposed to hepatitis." (Bird's Exhibits, Exhibit 25.) Baystate doctors' notes, which continue through November 27, 1994, confirm that Plaintiff had hepatitis C and conclude with a recommendation that a liver biopsy be considered. (See *id.*) Of course, by that time, Plaintiff had already had a liver biopsy.

granted Plaintiff's taxi and limousine license. (Pittsfield's Exhibits, Exhibit Z (Lee Deposition) at 63, 74–75.) [5]

The letters continued. Alexander wrote Williams on July 11, 1995, asking for an update on the status of her June 5, 1995 requests. (Alexander's Brief, Exhibit 4(II).) Williams wrote back on August 21, 1995, and indicated that Plaintiff had discontinued his interest in the taxi and limousine business. (*Id.*, Exhibit 4(JJ).) On August 28, 1995, Alexander informed Williams by letter that she needed confirmation of Plaintiff's divestiture as it appeared that Plaintiff still held business licenses. (*Id.*, Exhibit 4(KK).) Alexander also reminded Williams that she had not yet received an update regarding Plaintiff's medical condition. (*Id.*) Williams advised Alexander in a letter dated September 7, 1995, that he would respond further after he completed a trial. (*Id.*, Exhibit 4(LL).) On October 26, 1995, having heard nothing from Williams, Alexander wrote yet again seeking information as to the status of her prior requests. (*Id.*, Exhibit 4(MM).)

On October 30, 1995, Williams contacted Alexander to discuss in more depth the specific documentation needed. (*Id.*, Exhibit 4(T) (Alexander Affidavit) ¶ 40.) On November 22, 1995, by which time nothing further had ensued, Alexander inquired if Williams still represented Plaintiff. (*Id.*, Exhibit 4(NN).) Receiving no response, Alexander again wrote to Williams, this time on January 5, 1996. (*Id.*, Exhibit 4(OO).) On January 10, 1996, Williams wrote back stating that he no longer represented Plaintiff. (*Id.*, Exhibit 4(PP).) In the meantime, on December 29, 1995, Plaintiff contacted Dr. Bird, requesting that he give him copies of certain letters in his file. (Plaintiff's Exhibits, Exhibit 44.)

On January 29, 1996, Gogel called Alexander advising her that he might be representing Plaintiff once again. (Alexander's Brief, Exhibit 4(T) (Alexander Affidavit) ¶ 44.) The next day, January 30, 1996, Alexander wrote Gogel requesting that he advise her as soon as possible about the status of his representation. (*Id.*, Exhibit 4(QQ).) That very day, however, Plaintiff himself wrote Mayor Reilly directly, stating that he intended to file a civil action against the city and its agents for their allegedly unlawful attempts at barring his return to the Pittsfield Police Department. (*Id.*, Exhibit RR.)

In a February 13, 1996 letter, Gogel informed Alexander that he would not be representing Plaintiff. (*Id.*, Exhibit 4(SS).) Accordingly, the next day, Alexander wrote Plaintiff directly, requesting information as to whom she should contact regarding reinstatement. (*Id.*, Exhibit 4(TT).) On February 26, 1996, Plaintiff responded in a letter to Reilly indicating his belief, among other things, that Alexander was "very confused," that she had "done nothing but delay and attempt to block [his] attempts to resolve the matter" and that there would "be a price to pay" for the harassment he had allegedly suffered at the hands of Alexander and others. (*Id.*, Exhibit 4(UU).) On March 1, 1996, Reilly wrote Plaintiff back and ac-

---

5. Pittsfield claims that it only became aware of Plaintiff's taxi and limousine business when the local newspaper reported on February 24, 1994, that Plaintiff had been arrested while driving his limousine in New York state. (Pittsfield Facts at 9.) This statement is somewhat puzzling given that the License Board's approval of Plaintiff's license application— which included a safety inspection by the Police Department—occurred in early December, 1993. (See Pittsfield's Exhibits, Exhibit R.) It should be noted as well that Plaintiff was cleared of all charges stemming from the New York arrest. (See Alexander's Brief, Exhibit L.)

cepted his offer for a meeting. (Reilly's Brief, Exhibit F.)

On March 15, 1996, Plaintiff moved, pro se, to vacate the dismissal of Civil Action No. 91–30195–FHF on the grounds that Pittsfield had "deliberately failed" to execute the Settlement Agreement and had "failed to seriously, honestly and adequately respond" to his former attorneys' written inquiries. (Alexander's Brief, Exhibit 8.) In response, Pittsfield filed a lengthy memorandum which detailed its efforts to reinstate Plaintiff. (*Id.,* Exhibit 4.) On April 5, 1996, Senior Judge Frank H. Freedman found, on the basis of the pleadings before him, that Pittsfield had not breached the Settlement Agreement and, thus, vacation of the stipulation of dismissal was not required. (Alexander's Brief, Exhibit 8.) As Plaintiff now points out, however, neither Pittsfield's memorandum nor Alexander's affidavit filed in conjunction therewith mentioned Dr. Bird's July 5, 1994 letter. (Complaint ¶ 34.)

In late March or early April of 1996, Plaintiff had a meeting with Reilly, Alexander and Jim Williamson, the father of a councilwoman and a man described by Plaintiff as a "mediator." (Reilly's Brief, Exhibit G (Powell Deposition) at 294–96.) In a letter to Reilly dated April 16, 1996, Plaintiff confirmed that he had completely divested himself of his taxi and limousine business. (Docket No. 53: Affidavit of David B. Mongue ("Lee's Exhibits"), Exhibit C.) Then, on May 2, 1996, Lee, the police chief, wrote Plaintiff and requested current medical documentation. (Plaintiff's Exhibits, Exhibit 53.) The next day, however, Reilly wrote Plaintiff and informed him of his intention to reinstate him, to grant him maximum seniority and to pursue a special legislative act to regain all lost service for retirement purposes. (*Id.,* Exhibit 56.)

A special act was never pursued by Reilly. Rather, on May 20, 1996, Pittsfield allowed Plaintiff to resume employment as a police officer, but only upon his successful completion of the police academy. (Complaint ¶ 36; Plaintiff's Exhibits, Exhibit 57; see also Plaintiff's Amended Affidavit ¶ 19; Plaintiff's Exhibits, Exhibit 60.) In September of 1996, Plaintiff successfully completed both the physical and course requirements of the police academy with no accommodation for his hepatitis C. (Complaint ¶ 37.) Thereupon, Plaintiff was reinstated as a police officer. (See Alexander's Brief, Exhibit 4(WW).)

The complaint in this action was filed on September 8, 1997, and amended on May 11, 1999.[6] It has five counts, all of which seek redress for the delay in or interference with Plaintiff's reinstatement to the police force. Count I alleges a violation of 42 U.S.C. § 1981. Count II claims that Defendants violated 42 U.S.C. § 1983. Count III alleges a violation of Section 504 of the Rehabilitation Act of 1973 ("the Rehab Act"), 29 U.S.C. § 794. Count IV contends that the individual defendants engaged in a conspiracy to violate Plaintiff's civil rights. And Count V alleges breach of the Settlement Agreement.

Defendants' motions for summary judgment were all filed on May 1, 2000. (See Docket Nos. 46, 49, 56, 57 and 61.) On that date, Reilly and Lee also requested attorney's fees and costs (see Docket Nos. 49 and 63), which requests, this day, have been denied without prejudice by margin notation. Plaintiff filed a consolidated opposition to the motions on July 3, 2000 (Docket No. 68) and the matter was thereafter referred to this court for a report and recommendation. After several continuances, requested by counsel, oral argu-

---

**6.** Throughout these proceedings, Plaintiff has been represented by yet other counsel.

ment was held on September 12, 2000. Having carefully considered the parties detailed written and oral submissions, the court now offers its recommendation.

### III. *DISCUSSION*

 Before delving into the heart of the motions, the court wishes to address some preliminary matters. First, the Rehab Act, the focus of Count III, is limited to claims of disability "discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). In his memorandum of law, Plaintiff argues only that Pittsfield and Dr. Bird, but not the remaining three defendants, received federal funds. (Docket No. 68: Memorandum in Opposition to the Defendants' Motion(s) for Summary Judgment ("Plaintiff's Brief") at 26–37.) Although Plaintiff claimed at oral argument that Count III applies to all five defendants, it is quite clear that Lee, Alexander and Reilly, who in no way are "program[s] or activit[ies] receiving Federal financial assistance," are entitled to summary judgment on this claim. The court will recommend that Dr. Bird be granted summary judgment on Count III as well. While Dr. Bird may treat "Medicaid" patients, (Plaintiff's Exhibits, Exhibit 6 (Brian Kane Affidavit)), there is no evidence that Plaintiff's alleged discriminatory treatment arises "under" that program. 29 U.S.C. § 794(a).

Second, Count IV, the conspiracy claim, appears to target only the individual defendants, not Pittsfield. (See Complaint ¶¶ 57–60.) Plaintiff conceded as much at oral argument. The court, therefore, will recommend granting summary judgment in favor of Pittsfield on Count IV.

Third, with regard to the breach of contract claim, Count V, the contract at issue—the Settlement Agreement—was entered into by Plaintiff and Pittsfield only. Plaintiff concedes this in his written submissions. (See Complaint ¶ 62 (acknowledging that agreement is between plaintiff and Pittsfield); *id.* ¶ 64 (alleging merely that "Pittsfield, acting through its agents, servants and employees, . . . breached said contract"); Plaintiff's Brief at 41 (referring only to Pittsfield in breach of contract argument).) Moreover, Plaintiff acknowledged at oral argument that Count V is directed only at Pittsfield. Thus, although Alexander signed the agreement on behalf of Pittsfield and although Reilly, as Mayor, authorized the settlement, it appears that the individual Defendants—Alexander, Reilly, Lee and Dr. Bird—should be granted summary judgment on Count V.

In sum, only the following counts and defendants appear to exist for purposes of examining the remainder of Defendants' summary judgment motions:

> *Sections 1981 and 1983 (Counts I and II)*—against all Defendants (Pittsfield, Reilly, Lee, Alexander and Dr. Bird)
>
> *Conspiracy (Count IV)*—against Reilly, Lee, Alexander and Dr. Bird
>
> *Rehab Act (Count III)*—against Pittsfield
>
> *Breach of Contract (Count V)*—against Pittsfield

The court will discuss these counts and their corresponding defendants in that order.

### A. *42 U.S.C. §§ 1981 AND 1983 (COUNTS I AND II)*

Count I alleges that Defendants violated 42 U.S.C. § 1981 [7] and Count II claims

---

7. In full, section 1981, entitled "Equal rights under the law," states as follows:

 (a) Statement of equal rights

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evi-

violations of 42 U.S.C. § 1983[8]. Collectively, Counts I and II allege two general theories of liability: (1) that Defendants are liable for employment discrimination under the paradigm established by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); and (2) that Defendants are liable for retaliation. Before discussing the substance of these theories, including Defendants' various defenses, the court will address two threshold issues; first, whether section 1981 implies a cause of action against state actors separate and distinct from a section 1983 cause of action; and second, whether, with respect to his section 1981 claim against Pittsfield, Plaintiff is relieved from his obligation under section 1983 to allege that his civil rights were violated as a result of an official "policy or custom" as required by *Monell v. New York City Dep't of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

1. *Does Section 1981 Imply a Cause of Action Against State Actors Separate and Distinct from Section 1983?*

■ Relying on *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 109 S.Ct. 2702,

105 L.Ed.2d 598 (1989), Defendants argue that 42 U.S.C. § 1983 is Plaintiff's exclusive remedy against them for violation of the civil rights guaranteed by 42 U.S.C. § 1981. In response, Plaintiff argues that the Civil Rights Act of 1991 statutorily overruled *Jett* and, therefore, that his claims under sections 1981 and 1983 can exist as independent causes of action. In the court's view, Plaintiff has the better argument.

a. *Jett v. Dallas Indep. Sch. Dist.*

In *Jett,* the Supreme Court held that a black high school athletic director could not sue his employer, a municipality, under section 1981 for removing him from his job on the basis of race. At the time *Jett* was decided, section 1981 provided as follows:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981.

8. In pertinent part, section 1983 states as follows:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

dence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
(b) "Make and enforce contracts" defined
For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.
(c) Protection against impairment
The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

This language, the Supreme Court concluded, when read alongside section 1983 and in light of each section's history, indicated Congress' intent "that the explicit remedial provisions of § 1983 be controlling in the context of damages actions brought against state actors alleging violation of the rights declared in § 1981." *Jett,* 491 U.S. at 731, 109 S.Ct. 2702. Stated another way, *Jett* held that, when a claim is brought against a state actor, section 1983 provides the "exclusive" federal damages remedy for the violation of rights guaranteed by section 1981. *Id.* at 733, 109 S.Ct. 2702.

b. The 1991 amendment to section 1981

Section 101 of the Civil Rights Act of 1991 added two new subsections to section 1981, one of which will be discussed here, section 1981(c).[9] Subsection 1981(c) provides, in full, that "[t]he rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law." 42 U.S.C. § 1981(c). Whether this amendment overrules *Jett* appears to be a question of first impression within this circuit.

The Ninth Circuit Court of Appeals as well as a host of district courts and commentators have interpreted the new subsection (c) as overturning *Jett* and thus allowing direct causes of action against state actors for violations of section 1981. *See, e.g., Federation of African Am. Contractors v. City of Oakland,* 96 F.3d 1204, 1209, 1214 (9th Cir.1996) (citing numerous cases and commentaries); *Simmons v. Chicago Bd. of Educ.,* No. 97 CV 5451, 2000 WL 1720958, at *6 (N.D.Ill. Nov. 16, 2000) (unpublished); 13B CHARLES ALAN WRIGHT, ARTHUR R. MILLER,

EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3573 n. 6 (2000 pocket part) (citing *Federation of African Am. Contractors* for proposition that "[t]he Civil Rights Act of 1991 amended 28 U.S.C. § 1981 to allow an implied private cause of action against state actors who impair federal civil rights."). *But see Butts v. Volusia County,* 222 F.3d 891, 894 (11th Cir.2000) (concluding that Civil Rights Act of 1991 did not affect *Jett* ). Although the First Circuit has not weighed in on the issue—nor, it appears, has any district court within the circuit—it has, post–1991, arguably implied a cause of action against state actors under section 1981. *See Conward v. Cambridge Sch. Comm.,* 171 F.3d 12 (1st Cir.1999) (affirming summary judgment in section 1981 race discrimination case where plaintiff failed to sustain burden of proof); *Carter v. Rhode Island,* 68 F.3d 9 (1st Cir.1995) (allowing both section 1981 and section 1983 causes of action to survive summary judgment).

c. Analysis

▆ In the court's view, the rationale behind the Ninth Circuit's conclusion that section 1981, as amended, impliedly allows a direct cause of action against state actors is sound. In this circuit, as in the Ninth Circuit, a four-factor test outlined in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), "remains the touchstone of the modern implied remedy doctrine." *Federation of African Am. Contractors,* 96 F.3d at 1211. *See, e.g., Suter v. Artist M.,* 503 U.S. 347, 364 n. 16, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992); *Thompson v. Thompson,* 484 U.S. 174, 179, 108 S.Ct. 513, 98 L.Ed.2d 512 (1988); *Sterling Suffolk Racecourse Ltd. Partnership v. Burrillville*

---

**9.** In actuality, section 101 of the Civil Rights Act of 1991 designated the previous text of section 1981 as subsection (a) and added new subsections (b) and (c). *See* supra at n. 7. The new subsection (b) is discussed below with regard to Plaintiff's retaliation claim.

*Racing Ass'n, Inc.*, 989 F.2d 1266, 1268–69 (1st Cir.1993). According to *Cort*, the following factors are frequently considered in determining whether a statute implies a private cause of action:

(1) Is the plaintiff one of the class for whose "especial benefit" the statute was enacted; that is, does the statute create a federal right in favor of the plaintiff?

(2) Is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one?

(3) Is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?

(4) Is the cause of action one traditionally relegated to state law, so that it would be inappropriate to infer a cause of action based solely on federal law?

*See Cort*, 422 U.S. at 78, 95 S.Ct. 2080. *See also Sterling Suffolk Racecourse*, 989 F.2d at 1269 n. 4 (noting "that the fourth question is really a tote board for tallying the answers to all the other inquiries and, therefore, need not be considered separately").

■ As the Ninth Circuit found, the four *Cort* factors lead to an inevitable conclusion that the amended section 1981 contains an implied cause of action against state actors, thereby overturning *Jett. Federation of African Am. Contractors*, 96 F.3d at 1214. As to the first factor, the statute, by its plain terms, creates federal civil rights in favor of a class of persons that includes Plaintiff, i.e., the new statute "makes explicit that the rights 'protected

by [§ 1981(a) ]' are 'protected against impairment by nongovernmental discrimination and impairment under color of State law.'" *Id.* at 1211 (quoting 42 U.S.C. § 1981(c)). Regarding the second *Cort* factor, Congressional committee reports on the 1991 amendment "clearly contemplate that § 1981 rights are to receive parallel protections against state actors and private actors" and "[i]mplying a direct cause of action against state actors under 42 U.S.C. § 1981 is consistent with this intent." *Id.* at 1212–13 (citing H.Rep. No. 102–40(I), 102d Cong., 1st Sess. 92, reprinted in 1991 U.S.C.C.A.N. 549, 630; H.Rep. No. 102–40(II), 102d Cong., 1st Sess. 37, reprinted at U.S.C.C.A.N. 694, 731).[10] As for the third factor, the Ninth Circuit concluded, and this court agrees, "that an implied cause of action ... complements—rather than clashes with—the legislative scheme." *Id.* at 1214. Similarly, regarding the fourth *Cort* factor, the court agrees with the Ninth Circuit that "[p]rivate causes of action against state actors who impair federal civil rights have *not* been traditionally relegated to state law." *Id.* (emphasis in original).

The court, therefore, recommends the adoption of the Ninth Circuit's conclusion that the amended section 1981 overturns *Jett's* holding that section 1983 provides the exclusive federal remedy against state actors for violations of section 1981 rights. At bottom, this court believes, section 1981 now contains an implied cause of action against state actors.

10. To be sure, as the Ninth Circuit points out, the legislative history surrounding the amendment suggests that Congress' intent in adding subsection (c) was to codify *Runyon v. McCrary*, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976), which held that section 1981 rights are protected against *private* discrimination as well as against *state* discrimination. *Id.* at 1212. However, "[b]ecause § 1981(c) affords *identical protection* against

'impairment by nongovernmental discrimination' and 'impairment under color of State law,' and because § 1981(c) implicitly codifies an implied cause of action against private defendants," this court, like the Ninth Circuit, "infer[s] that § 1981(c) *also* contains an implied cause of action against state actors who 'impair' a claimant's § 1981 rights." *Id.* at 1213 (emphasis in original).

2. *Under Section 1981, is Plaintiff Relieved from Alleging that Pittsfield Violated His Civil Rights as a Result of an Official "Policy or Custom"?*

■ Assuming section 1981 contains an implied cause of action, the next question is whether Plaintiff—with regard to Pittsfield—is relieved from alleging, as he must do with respect to section 1983, that his civil rights were violated as a result of an official "policy or custom." *See Monell,* 436 U.S. at 694, 98 S.Ct. 2018. In the court's view, the answer to that question is no. Stated another way, for Plaintiff to maintain Counts I and II against Pittsfield he must allege, for both counts, that his civil rights were violated as the result of an official "policy or custom."

In 1978, the Supreme Court held in *Monell* that a civil rights plaintiff suing under 42 U.S.C. § 1983 must allege that his injury resulted from an official "policy or custom." *Id.,* 436 U.S. at 694, 98 S.Ct. 2018. This principle was based both on the language of section 1983, which imposes liability only where a state actor "under color of some official policy, 'causes' an employee to violate another's constitutional rights," *id.* at 692, 98 S.Ct. 2018, and the legislative history of the Civil Rights Act of 1871, the precursor to section 1983, wherein Congress rejected a proposal to impose vicarious liability under that statute, *id.* at 691, 98 S.Ct. 2018. *See generally Federation of African Am. Contractors,* 96 F.3d at 1208.

Eleven years later in *Jett,* the Supreme Court—in addition to implying no section 1981 cause of action against state actors—held that a plaintiff who sues a municipality under section 1983 for a violation of his section 1981 rights may not rely upon the doctrine of respondeat superior but must satisfy section 1983's "policy or custom" requirement. *Jett,* 491 U.S. at 735–36, 109 S.Ct. 2702. In reaching this conclusion, *Jett* relied on Supreme Court decisions, including *Monell,* which stated that 1983 precluded vicarious municipal liability. *See id.* at 733–35, 109 S.Ct. 2702 (citing, e.g., *Monell, Johnson v. Ry. Express Agency, Inc.,* 421 U.S. 454, 465, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975), and *Moor v. Alameda County,* 411 U.S. 693, 710 n. 27, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973)).

Since the passage of the Civil Rights Act of 1991, however, several courts, as indicated, have concluded that the amended section 1981 implies a separate cause of action against state actors. See discussion, supra. Some of those same courts have also asked whether the new statute imposes respondeat superior liability upon municipalities, that is, whether *Jett*'s second principle has been statutorily overturned as well. Most such courts have concluded that the amendment preserves *Jett*'s second holding, namely, that plaintiffs suing municipalities for civil rights violations under section 1981 must establish that their injury was caused by an official "policy or custom." *See, e.g., Federation of African Am. Contractors,* 96 F.3d at 1215; *Johnakin v. City of Philadelphia,* No. Civ. A. 95–1588, 1996 WL 18821, at *4 (E.D.Pa. Jan.18, 1996); *Gallardo v. Bd. Of County Comm'rs,* 857 F.Supp. 783, 786–87 (D.Kan. 1994); *see also Philippeaux v. N. Cent. Bronx Hosp.,* 871 F.Supp. 640, 654–56 (S.D.N.Y.1994) (not resolving whether section 1981(c) overturns *Jett*'s first principal, but holding that "policy or custom" must yet be established). Only one commentator has been cited by the Ninth Circuit as suggesting that the amendment not only creates a private cause of action against municipalities, but also subjects them to respondeat superior liability. *See Federation of African Am. Contractors,* 96 F.3d at 1210 n. 13 (citing Leon Friedman, *Relationship Between Title VII, Section 1981, 1983, ADEA, the Equal Pay Act and State*

*Causes of Action for Employment Discrimination*, C108 American Law Institute–American Bar Association Course of Study 367, 378 (June 1, 1995)). Again, it appears that no court in this circuit has addressed the issue.[11]

This court agrees with the overwhelming post-*Jett* authority that the 1991 amendment to section 1981 does not impose respondeat superior liability on municipalities. As the Ninth Circuit puts it:

> [T]he new § 1981(c) contains language very similar to that of 42 U.S.C. § 1983. Subsection 1981(c) provides that § 1981(a) rights are protected against "impairment . . . *under color* of State law," while 42 U.S.C. § 1983 imposes liability for the deprivation of rights resulting from actions taken "*under color* of any statute, ordinance, regulation, custom, or usage, of any State[.]" The Supreme Court based its "policy or custom" requirement, in part, on this very language. Because Congress made use of very similar language in enacting § 1981(c), we conclude that it thereby intended to import into the new subsection the traditional "policy or custom" requirement set forth in *Monell*, . . . and applied to § 1981 violations in *Jett*.

*Federation of African Am. Contractors*, 96 F.3d at 1215 (emphasis added by Ninth Circuit). Accordingly, with regard to Pittsfield, this court concludes that Plaintiff must allege, for both Counts I and II,

that his civil rights were violated as a result of an official "policy or custom." The court will apply this standard below.

3. *Should Plaintiff's Claims Under Sections 1981 and 1983 Survive Defendants' Motions for Summary Judgment?*

The bulk of the parties' written arguments concern Plaintiff's claim that he was subjected to racial discrimination in his employment in violation of sections 1981 and 1983.[12] Also, as indicated, Plaintiff alleges that Defendants violated sections 1981 and 1983 through retaliation.

a. Employment Discrimination

■ While sections 1981 and 1983 differ in the types of discrimination they proscribe, courts have held that, when employment discrimination is at issue in such cases, standards pertinent to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., apply even when, as here, no direct claim under Title VII has been made.[13] *See T & S Service Associates, Inc. v. Crenson*, 666 F.2d 722, 724 n. 2 (1st Cir.1981); *Stubblefield v. City of Jackson*, 871 F.Supp. 903, 908 n. 7 (S.D.Miss.1994). Accordingly, insofar as Counts I and II allege racial discrimination in the context of Plaintiff's employment, the court, as have the parties, will apply the three stage, burden-shifting framework first outlined in *McDonnell Douglas*, and further explained and refined in *Texas*

---

**11.** Plaintiff cites *Springer v. Seaman*, 821 F.2d 871 (1st Cir.1987), in which the First Circuit, citing *Haugabrook v. City of Chicago*, 545 F.Supp. 276, 281 (N.D.Ill.1982), held "that the doctrine of respondeat superior is applicable to claims brought under 42 U.S.C. § 1981." *Id.* at 881. However, both *Springer* and *Haugabrook* are pre-*Jett* cases and, therefore, have no applicability here.

**12.** In his memorandum of law, Plaintiff does not address "handicap" discrimination with respect to Counts I and II. Thus, the court

only considers Counts I and II in the context of race-based claims.

**13.** According to Lee, Plaintiff may have been able to assert a Title VII claim but, unfortunately for him, failed to follow the procedural requirements imposed by that statute. (See Docket No. 51: Defendant Gerald Lee's Memorandum in Support of his Motion for Partial Summary Judgment and Costs ("Lee's Brief") at 15 n. 14.)

*Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 254–55, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506–08, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), and *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). *See Benham v. Lenox Sav. Bank,* 118 F.Supp.2d 132, 141 (D.Mass.2000).

At the first stage of *McDonnell Douglas,* a plaintiff must establish a prima facie case of discrimination by a preponderance of the evidence. *See Thomas v. Eastman Kodak Co.,* 183 F.3d 38, 56 (1st Cir.1999), *cert. denied,* 528 U.S. 1161, 120 S.Ct. 1174, 145 L.Ed.2d 1082 (2000). At the second stage, the burden shifts to the defendant to produce a valid, non-discriminatory reason for the adverse employment action. *See id.* At the third stage of the analysis, the burden shifts back to the plaintiff to establish, by a preponderance of the evidence, "that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Reeves,* 530 U.S. at 143, 120 S.Ct. 2097 (citations and internal quotation marks omitted).

 If this were a Title VII case, not a civil rights action, Plaintiff could not make out a prima facie case of discrimination by the individual defendants, Alexander, Lee, Dr. Bird and Reilly. None of these individuals was Plaintiff's "employer." *See Sauers v. Salt Lake County,* 1 F.3d 1122, 1125 (10th Cir.1993) (indicating that Title VII actions are not appropriate against government officials in their personal capacities as they are not the plaintiff's "employer"). *See also Horney v. Westfield Gage Co.,* 95 F.Supp.2d 29, 33–36 (D.Mass. 2000) (in which this court held, on the basis of overwhelming authority, that there is no individual liability under Title VII). However, there is a fundamental difference between Title VII and sections 1981 and 1983. "Title VII applies specifically to 'employers[,]' 42 U.S.C. § 2000e–2[,] ... [while] section 1983 permits a lawsuit against a 'person' in his individual capacity. *See* 42 U.S.C. § 1983." *McCue v. Kansas Dep't of Human Resources,* 165 F.3d 784, 788 (10th Cir.1999). *See also Schanzer v. Rutgers Univ.,* 934 F.Supp. 669, 678 n. 12 (D.N.J.1996). Similarly, section 1981 does not limit itself to "employer" defendants. *See* 42 U.S.C. § 1981. *See also Johnson v. Resources for Human Development, Inc.,* 843 F.Supp. 974, 978 (E.D.Pa.1994) (personal liability is available under section 1981 so long as some affirmative link causally connects the actor to the discriminatory action) (citing *Allen v. Denver Public Sch. Bd.,* 928 F.2d 978, 983 (10th Cir.1991)). In short, the court will analyze the *McDonnell Douglas* paradigm with respect to all five Defendants, even though the paradigm does not quite fit.

(i) Plaintiff's prima facie case

 Under the *McDonnell Douglas* framework, Plaintiff shoulders the initial burden of producing a prima facie case of unlawful discrimination. This includes demonstrating that (1) he is a member of a protected class; (2) an adverse employment action was taken against him; (3) he was qualified for the employment he held; and (4) his position remained open or was filled by a person whose qualifications were similar to his. *See Rodriguez–Cuervos v. Wal–Mart Stores, Inc.,* 181 F.3d 15, 19 (1st Cir.1999). "For the prima facie case, a disparate impact plaintiff must 'identify and relate specific instances where persons situated similarly in all relevant aspects were treated differently.'" *Molloy v. Blanchard,* 115 F.3d 86, 91 (1st Cir.1997) (quoting *Dartmouth Review v. Dartmouth College,* 889 F.2d 13, 19 (1st

Cir.1989)) (further citation and internal quotation marks omitted).

As applied here, Plaintiff has overcome the "modest" prima facie hurdle. *Fernandes v. Costa Bros. Masonry, Inc.*, 199 F.3d 572, 580–81 (1st Cir.1999). Plaintiff is African–American and thus a member of a protected class. Defendants assertedly took an adverse employment action against him, i.e., they delayed or interfered with his reinstatement to the police force and, although Defendants argue that it justifiably took some time to make the determination, he was allegedly qualified for the job. Finally, Plaintiff has alleged, however thinly, that similarly situated white persons were treated differently. For example, Plaintiff claims that only his reinstatement was "unreasonably" delayed, that no white police officers were required to divest themselves of outside employment or businesses, and that white officers returning to employment were not required to get a full physical or re-attend the police academy.

### (ii) Defendants' nondiscriminatory explanations

The burden is on Defendants at the second stage of the *McDonnell Douglas* analysis to proffer a nondiscriminatory reason or reasons for the adverse employment action. *See Thomas*, 183 F.3d at 56. Defendants submit two such reasons here. First, they note that Plaintiff's physical examination disclosed that Plaintiff had hepatitis C, a condition which Dr. Bird determined rendered Plaintiff medically disabled. Second, they assert that Plaintiff's interest in an outside business created a conflict of interest which stalled his reinstatement. In the court's estimation, these justifications are sufficient to get Defendants past the second analytical step.

### (iii) Pretext

At the third stage of the *McDonnell Douglas* analysis, the burden shifts back to Plaintiff to establish by a preponderance of the evidence that the facially legitimate reasons offered by Defendants were not their true reasons, but instead, "were a pretext for discrimination." *Reeves*, 530 U.S. at 143, 120 S.Ct. 2097. At this point, the court finds it necessary to analyze the evidence as it relates to each Defendant, mindful that at summary judgment the pertinent issue is whether Plaintiff has provided evidence sufficient to "enable[ ] a factfinder reasonably to infer that unlawful discrimination was a determinative factor in the adverse employment action." *Feliciano De La Cruz v. El Conquistador Resort and Country Club*, 218 F.3d 1, 6 (1st Cir.2000) (citation and internal quotation marks omitted.)

### (A) Dr. Bird

■ There is no real evidence and, thus, no reasonable inference that any of Dr. Bird's actions were a pretext for unlawful discrimination. The summary judgment evidence proffered simply reveals the following.

In October of 1993, Dr. Bird, upon request from Pittsfield's personnel department, examined Plaintiff and noted an abnormal liver function. A November 10, 1993 test indicated a positive reaction for hepatitis C—"an inflammatory condition ... [that] is a major concern to the individual [who] has it"—and so Dr. Bird sent Plaintiff to a specialist. That specialist, as well as a doctor chosen by Plaintiff, both indicated to Dr. Bird in December of 1993 that there was a good chance that Plaintiff had hepatitis C. Accordingly, it was perfectly reasonable for Dr. Bird to opine on December 21, 1993, that Plaintiff had "chronic active hepatitis." To the extent Dr. Bird also opined that Plaintiff was

medically "disqualified" from employment, Alexander immediately assured Plaintiff's counsel that a legal conclusion of disability would await a liver biopsy.

No fact surrounding the liver biopsy raises a reasonable inference that Dr. Bird's actions were a pretext for anything. Plaintiff, as well as each of the many doctors he consulted on his own, confirmed that a liver biopsy was necessary for an accurate diagnosis. Further, any delay in arranging the biopsy, which finally took place in the Spring of 1994, was solely attributable to Plaintiff. In essence, Dr. Bird was in a holding pattern until Dr. Borhan–Manesh released his biopsy report on May 3, 1994.

Nor can there be any reasonable inference that Dr. Bird's actions after the biopsy report was released were pretextual. Rather, the evidence shows that upon receiving Dr. Borhan–Manesh's report, Dr. Bird immediately researched the medical ramifications of hepatitis C and, within a few weeks, consulted with public health officials at the U.S. Center for Disease Control and the University of Massachusetts Medical Center. When these officials informed Dr. Bird in a letter dated June 28, 1994, that they knew of nothing to restrict Plaintiff from performing his duties, Dr. Bird promptly shared this information with both Reilly and Alexander and wrote his letter of July 5, 1994. In his letter, Dr. Bird concluded that, in his opinion, Plaintiff was no longer medically "disqualified" from employment. At that point, Dr. Bird's work was essentially done.

To be sure, Plaintiff indicates that on July 28, 1994, and again on November 11, 1994, he contacted Dr. Bird about the possibility of pursuing disability retirement options and that, on neither occasion, did Dr. Bird reveal the contents of his July 5th letter. Nor did Dr. Bird provide Plaintiff a copy of the July 5th letter on December 29, 1995, when Plaintiff requested correspondence from his file. However, Dr. Bird had been specifically advised by Alexander, his employer's legal counsel, to keep the letter "confidential." More to the point, there is no evidence that Dr. Bird had any obligation to release the letter to Plaintiff (or anyone else for that matter) or any reasonable inference that his decision not to tell Plaintiff of its existence was pretextual.

Finally, with respect to Dr. Bird, Plaintiff's own testimony demonstrates a lack of pretext:

Q. You had been to [Dr. Bird] over the years while you were a city police officer?

A. On occasions, yes.

Q. He never indicated any personal animus against you?

A. No.

Q. Never indicated any racial animus against you?

A. Not that I can remember, no.

. . . . .

Q. Do you believe [Dr.] Bird acted because of racial animus against you?

A. I don't have any idea why he did what he did.

. . . . .

Q. And if I used the term "racist" here today, we've used an expression "racial animus" here, you understand that they are synonymous, they just have different—a racist is a person?

A. Right.

Q. Racial animus is something consistent with that, that's something that a person has, correct?

A. That's correct.

(Bird Exhibits, Exhibit 16 (Powell Deposition) at 37, 197, 281.) Plaintiff's former

counsel, Gogel, similarly testified that he did not "believe that Dr. Bird had any ill will or animosity towards [Plaintiff] at any time." (*Id.*, Exhibit 26 (Gogel Deposition) at 113.) Accordingly, the court will recommend that Dr. Bird be granted summary judgment on the employment discrimination components of Counts I and II.

(B) Lee

■■ The relevant summary judgment evidence with regard to Lee, the police chief, is also meager, consisting of only four items over a three year period. At bottom, the court believes that there is no reasonable inference that any of Lee's actions were a pretext for unlawful discrimination.

First, the terms of the Settlement Agreement conditioned Plaintiff's reinstatement, in part, "upon his successful completion of certain re-training as determined by . . . Lee . . . and whatever other conditions . . . Lee determines are necessary in order to facilitate [Plaintiff]'s re-orientation into the Department for both his own interests and the best interests of the Department." These terms vested Lee with a good deal of control over Plaintiff's reinstatement and, as a result, weaken if not eviscerate any pretext argument with respect to him.

Second, around May 6, 1994, Plaintiff asked Lee whether he might be able to obtain a "disability" pension if he was unable to return to his job as a police officer. At about the same time, Alexander and Lee discussed whether Plaintiff had a "communicable disease" and then, on May 11, 1994, Lee, Alexander and Reilly met to further discuss Plaintiff's situation. At that point, Plaintiff had just obtained results from Dr. Borhan–Manesh's biopsy— which indicated that Plaintiff had chronic hepatitis C—but Dr. Bird had not yet written his July 5, 1994 letter indicating that he no longer thought Plaintiff's condition

medically "disqualified" him from employment. Moreover, it does not appear that Lee was ever sent a copy of the July 5th letter. In fact, there is no evidence that Lee had any active involvement in any medical decision.

Third, on approximately June 5, 1995, Lee opined to Alexander that Plaintiff could not be a police officer while operating a taxi business in Pittsfield. In Lee's view, Plaintiff's business differed from other officers' businesses insofar as it presented a potential conflict of interest; the Police Department was an agent of the License Board. In essence, Lee argues and the court agrees that Plaintiff cannot establish pretext since he cannot show that "persons situated similarly in all relevant respects were treated differently" by him. *Molloy*, 115 F.3d at 91. Thus, Plaintiff has not cited any evidence that Lee ever hired or retrained white police officers with comparable medical conditions or business interests. Indeed, there is no evidence that Lee actually made *any* employment decision.

Fourth, on May 2, 1996, a few weeks after Plaintiff confirmed in writing to Reilly that he had completely divested himself of his business, Lee wrote Powell requesting current medical documentation. The next day, however, Reilly informed Plaintiff that he intended to reinstate him and, a few months later, Plaintiff was finally reinstated. Plaintiff offers no argument as to how these facts even raise an inference of discrimination by Lee, and the court will not create one out of whole cloth.

Finally, as with Dr. Bird, Plaintiff has specifically testified to a lack of discriminatory animus on Lee's part:

Q. Do you believe that Chief Lee holds any ill will against you?

A. No. I don't believe so, no.

. . . . .

Q. ... [A]s you sit here today, you don't have any facts to support any suggestion that Chief Lee discriminated against you because of your race, do you?

[Plaintiff's counsel]: Objection.

A. I don't have any personal knowledge other than his name being submitted throughout the documentation submitted by Solicitor Alexander.

Q. And you don't have any facts to relay to us here today that he was somehow involved in this retaliation against you because of that prior lawsuit?

[Plaintiff's counsel]: Objection.

A. To my personal knowledge, no.

(Lee's Exhibits, Exhibit A (Powell Deposition) at 313, 315–16.) The Court will thus recommend that Lee be granted summary judgment on the discrimination components of Counts I and II.

(C) Alexander

██ The quantum of summary judgment evidence is somewhat greater with respect to Alexander. On or about December 21, 1993, Alexander advised Plaintiff's then-counsel that Plaintiff was not legally disqualified. In February and March of 1994, Alexander so informed Plaintiff's new counsel, but indicated that Pittsfield still needed the results of a medical biopsy. Those results were not transmitted to Alexander until around May 6, 1994, whereupon Alexander immediately researched the legal ramifications of hepatitis C and the Americans With Disabilities Act. In the court's view, there can be no reasonable inference from these facts that Alexander engaged in unlawful discrimination.

Although still other evidence is troubling, it too does not raise a reasonable inference that Alexander's actions were pretextual for unlawful discrimination. As indicated, on July 5, 1994, Dr. Bird sent Alexander a letter indicating that he no longer thought Plaintiff suffered from a medical condition which would disqualify him from returning to police work. Alexander, however, requested Dr. Bird not to reveal his report to anyone, including Plaintiff. In fact, one week later, on July 13, 1994, Alexander indicated to Plaintiff's counsel that Dr. Bird had not yet "made a decision on [Plaintiff's] qualification for duty." Then, on November 22, 1994, Alexander wrote a letter to Plaintiff's attorney reminding him that Dr. Bird was holding off on issuing his report until Plaintiff made a decision with regard to disability. Further, in response to Plaintiff's motion to vacate the dismissal of his earlier discrimination case, Alexander filed an affidavit which—while detailing, together with fifty-two attached exhibits, the efforts Pittsfield had taken to get Plaintiff reinstated—failed to mention or append Dr. Bird's July 5th report.

Unlike Plaintiff, the court does not view Alexander's secreting the July 5th report as a smoking gun with regard to his claims of discriminatory animus. To be sure, it is conceivable that Alexander's failure to mention the July 5th report at that time reflected an intent to mislead. Thus, a fair inference may be drawn that Alexander, knowing of Plaintiff's interest in exploring disability retirement benefits, concealed Dr. Bird's July 25th report in the hope that Plaintiff would opt for disability benefits in lieu of reinstatement. This "deception" may have been motivated by a positive desire to assist Plaintiff in receiving disability benefits or by a negative choice to encourage the retirement of an individual who had been a thorn in Pittsfield's side. In this vein, both Plaintiff and his former counsel aver that they would not have sought disability retirement options had they known, in a timely manner, of the July 5th report. (Plaintiff's Amended Affi-

davit ¶ 9; Plaintiff's Exhibits, Exhibit 19 (Gogel Deposition) at 120–21.) In Plaintiff's counsel's words, "If I had seen [Dr. Bird's letter] on July 5th, . . . I would have demanded [Plaintiff's] immediate reinstatement . . . [a]nd if that didn't happen, I would have filed suit." (Plaintiff's Exhibits, Exhibit 19 (Gogel Deposition) at 120.)

Nonetheless, the court finds no reasonable inference that "unlawful discrimination was a determination in the factor in" Alexander's actions. *Feliciano Dde La Cruz*, 218 F.3d at 6. Although as addressed below, this finding will not save Alexander from Plaintiff's claims of retaliation, the absence of evidence tying pretext to discriminatory animus necessarily calls for summary judgment for Alexander with respect to the discrimination parts of Counts I and II.

### (D) Reilly

 Reilly plays an even smaller part in the discrimination portions of Counts I and II. Although Reilly, as the ultimate appointing authority, helped negotiate the Settlement Agreement, he essentially disappeared from the picture until May of 1994 when he met with Alexander and Lee after they had received Dr. Borhan–Manesh's report. Thereafter, Reilly was informed of the June 28, 1994 letter to Dr. Bird from the public health officials regarding hepatitis C and was sent copies of some of Alexander's correspondence. None of these actions, however, reasonably infers that Reilly was acting with a discriminatory purpose. There is also no evidence that Reilly was formally notified of Dr. Bird's July 5, 1994 report. Moreover, his purported comment to Alexander on November 14, 1994 (that she should "talk to Gogel about [Plaintiff] finding a [doctor] who will say what [Plaintiff] wants!"), while perhaps relevant to Plaintiff's retaliation claim, says nothing about unlawful discrimination.

Following the events of 1994, the next "fact" linked to Reilly is his receipt of letters, dated January 30 and February 26, 1996, directly from Plaintiff. Reilly responded to these overtures in a letter dated March 1, 1996, offering to meet with Plaintiff. In fact, a meeting was held within a few weeks. At his deposition, Plaintiff described the meeting as follows:

A. We talked about back pay, that issue.

Q. How did you get back to that?

A. We went in and started talking about what it's going to take to resolve this.

Q. You go in and say, I want to go back to work, Mayor?

A. Right.

Q. What is his response?

A. That we could—basically, in the letter I told him that I wasn't an unreasonable person and I would sit down with him man to man. I didn't want to deal with Kate Alexander. In fact, I refused to. And I told him if he wanted to sit down and talk to me, that I think we could work something out. I don't like to fight. I wanted to put this behind me.

Q. So he accepts your offer?

A. Yes.

Q. Sits down with you?

A. Yes.

Q. You say, in essence, I want to go back to work, sooner rather than later?

A. Right.

Q. And I'm through being jerked around?

A. Right. But there was an issue of back pay.

. . . . .

Q. And the mayor says, fine, we'll get you back to work?

A. Right. Well, he told me about the back pay, go home, come up with some figures, he said, but, you know, be fair, you know. And then he said, you know, he felt that I should take the job back right away and then we could work on the figures later. You know, after I resolved that. Just go back to work.

Q. So the mayor wanted you back to work?

A. Yeah.

Q. Post haste?

A. Yeah. Like I said, I went back to work in May so it was shortly after this that I went back.

(Reilly Brief, Exhibit G at 297–99.) On May 3, 1996, once Plaintiff had confirmed to Reilly that he had divested himself of his business, Reilly wrote Plaintiff and informed him of his intention to reinstate him, to grant him maximum seniority and to pursue a special legislative act to regain all lost service for retirement purposes.

In the court's view, the facts adduced with respect to Reilly do not support a reasonable inference that his actions were pretextual for unlawful discrimination. Indeed, as with other defendants, Plaintiff testified that he did not believe that Reilly, individually, acted against him out of any racial animus. (See Reilly's Brief, Exhibit G (Powell Deposition) at 301–02.) The court will therefore recommend that Reilly too be granted summary judgment on the discrimination components of Counts I and II.

### (E) Pittsfield

■ For reasons similar to those applied to Alexander and Reilly, the court believes that Pittsfield should be granted summary judgment with respect to those parts of Counts I and II which allege employment discrimination. Thus, even were the court to assume that Reilly—on behalf of Pittsfield—concurred with Alexander in concealing Dr. Bird's July 5th report from Plaintiff, there is no evidence, either direct or indirect, that Reilly was motivated by a racially discriminatory animus.

Moreover, Plaintiff fails to cite evidence, other than his own "information and belief," that his initial physical examination was any different than that undergone by Pittsfield's white police officers or that white officers returning to duty were not required to re-attend the police academy. (Plaintiff's Amended Affidavit ¶¶ 7, 19.) Plaintiff also neglects to mention that he specifically agreed in the Settlement Agreement that his reinstatement was conditions on his passing a physical and psychological examination and other reasonable requirements to be deterred by Lee.

Finally, Plaintiff fails to cite any evidence that Pittsfield or Reilly ever hired or retained white police officers with comparable medical conditions or business interests. The instances where white police officers were permitted to moonlight or run their own businesses were dissimilar; the businesses were either located outside city limits or involved fields over which Pittsfield or Reilly exercised no special regulatory authority. In the words of the First Circuit, to use a "greengrocer's metaphor," rather than comparing apples to apples, Plaintiff appears to have "presented the ... court with two persimmons and a pear." *Conward v. Cambridge Sch. Comm.*, 171 F.3d 12, 20 (1st Cir.1999). Accordingly, the court will recommend that Pittsfield, like the individual defendants, be granted summary judgment on those portions of Counts I and II that

allege employment discrimination.[14]

### b. Retaliation

As explained, the court believes that all five defendants are entitled to summary judgment on the employment discrimination components of Counts I and II since their actions cannot be said, as a matter of law, to have been a pretext for unlawful discrimination. Plaintiff nonetheless maintains that Defendants may be liable under both sections 1981 and 1983 for unlawfully retaliating against him for engaging in protected activity. The court agrees with respect to three of those defendants, Alexander, Reilly and Pittsfield.

#### (i) Section 1983 retaliation

 Under section 1983, a plaintiff may allege retaliation by state actors for exercising his constitutional rights. *See Guilloty–Perez v. Fuentes–Agostini*, 196 F.3d 293 (1st Cir.1999); *McDonald v. Hall*, 610 F.2d 16, 18 (1st Cir.1979). When faced with a motion for summary judgment on a section 1983 retaliation claim, the plaintiff must demonstrate two genuine issues of material fact: (1) that the disciplined conduct was constitutionally protected, and (2) that the plaintiff's punishment was motivated, in whole or in part, by his conduct. *Graham v. Henderson*, 89 F.3d 75, 80 (2nd Cir.1996) (citing *Mount Healthy Sch. Dist. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)); *Shabazz v. Cole*, 69 F.Supp.2d 177, 197 (D.Mass.1999). If the plaintiff meets these burdens, the state actors "must show by a preponderance of the evidence that they would have disciplined the plaintiff 'even in the absence of the protected conduct.'" *Graham*, 89 F.3d at 79 (quoting *Mount Healthy*, 429 U.S. at 287, 97 S.Ct. 568). *Accord Shabazz*, 69 F.Supp.2d at 197.[15]

#### (A) Plaintiff's burdens

With regard to the first part of the inquiry, Plaintiff asserts that the conduct for which he was disciplined—"address[ing] his concerns in the courts" (Plaintiff's Brief at 21)—was constitutionally protected. This is undoubtedly true. *See Lewis v. Casey*, 518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996); *Shabazz*, 69 F.Supp.2d at 197 (citing cases). Still, in order to ultimately prevail at trial, Plaintiff must prove that the alleged "punishment" meted out—delaying or impeding his reinstatement as a police officer—was motivated at least in part by Plaintiff's constitutionally protected conduct.

Unfortunately for Plaintiff, "a retaliatory state of mind typically is not susceptible to proof by direct evidence." *Ferranti v. Moran*, 618 F.2d 888, 892 (1st Cir.1980). *Accord Shabazz*, 69 F.Supp.2d at 197. Knowing that, Plaintiff contends that an inference of retaliation, at least for purposes of overcoming summary judgment, is warranted in light of several circumstantial themes: his being required to have a liver biopsy, attend the police academy for a second time and take a new physical, as well as the concealment of Dr. Bird's July 5, 1994 report. (See Plaintiff's Brief at 21–22.) As before, the court will address each defendant separately.

---

**14.** A *Monell*-based "policy or custom" analysis might also doom Plaintiff's employment discrimination claim against Pittsfield. However, since the court believes that no reasonable inference of unlawful discrimination exists with respect to any individual, it discusses the "policy or custom" issue in the context of retaliation only. *See* infra.

**15.** Pittsfield's argument to the contrary, it appears as though a section 1983 retaliation claim need not be subsumed into a Title VII employment discrimination cause of action. Many of the section 1983 retaliation cases— e.g., *Graham, McDonald* and *Shabazz*—are brought by prison inmates who are not claiming retaliation in the employment context.

### (1) Lee

■ Plaintiff's allegations of retaliation with respect to Lee carry little weight. Again, the Settlement Agreement specifically states that "Plaintiff's reinstatement was conditioned, in part, upon his successful completion of certain re-training as determined by . . . Lee, . . . and whatever other conditions . . . Lee determines are necessary." Lee cannot be faulted for doing what the Settlement Agreement specifically authorized. Further, with regard to the liver biopsy, Plaintiff's own physicians, Drs. DeYeso and Gilbert, as well as subsequent advice he obtained from the Baystate Medical Center, confirmed that hepatitis C can only be definitively diagnosed by a liver biopsy. In fact, there is no evidence that Lee was actively involved in any medical decision. Perhaps most importantly, Plaintiff has testified that he does not believe Lee discriminated against him or "was somehow involved in . . . retaliation against [him] because of th[e] prior lawsuit." (Lee's Exhibits, Exhibit A (Powell Deposition) at 315-16.) Accordingly, the court will recommend that summary judgment be granted Lee on the retaliation component of Count II.

### (2) Alexander

■ The retaliation evidence with regard to Alexander is sufficient, in the court's view, to overcome Plaintiff's summary judgment burden. In short, it is reasonable to infer that Alexander's alleged concealment of Dr. Bird's report, together with other actions, may have been motivated, at least in part, by Plaintiff's prior litigation.

To be sure, as Alexander points out, she had no substantive relationship with any of the parties prior to January of 1992, *after* Plaintiff had filed his initial lawsuit, and that Plaintiff himself may have been responsible for much of the delay in his reinstatement. Indeed, even Plaintiff's former counsel knew of no action by or statement from Alexander which would have led him to believe that Alexander's activities were retaliatory. (Alexander's Brief, Exhibit 7 (Gogel Deposition) at 117.) Still, it is undisputed that Alexander signed the Settlement Agreement on Pittsfield's behalf, and it appears from subsequent correspondence that Alexander was the point-person in returning Plaintiff to the police force. (See Alexander's Brief, Exhibit 4(A).) Moreover, as indicated, Alexander had many opportunities to reveal Dr. Bird's report—including the post-verdict proceedings in Civil Action No. 91-30195-FHF—but did not do so. Indeed, as described, some of the letters may be viewed as intentionally deceptive. At bottom, to the extent Alexander's alleged actions in concealing Dr. Bird's report impeded or in any way contributed to the delay in Plaintiff's reinstatement, the court believes that it is reasonable to infer that she may have been sufficiently motivated by unlawful retaliation.

### (3) Dr. Bird

■ In contrast to Alexander, the court deems it unreasonable to pin any retaliatory motivation on Dr. Bird. It was Alexander's, not Dr. Bird's, decision to keep the July 5, 1994 report "confidential." Moreover, as indicated, deposition testimony from both Plaintiff and his former counsel demonstrate that Dr. Bird never exhibited any animus toward Plaintiff. Accordingly, the court will recommend that summary judgment be granted Dr. Bird with respect to the retaliation component of Count II.

### (4) Reilly

■ As with Alexander, the court believes that the retaliation evidence with respect to Reilly sufficiently supports

Plaintiff's summary judgment burden. Alexander's file note of November 14, 1994, (Plaintiff's Exhibits, Exhibit 62), indicates that Plaintiff went to see Dr. Bird the previous Friday, that Plaintiff wanted Dr. Bird to complete a disability statement and that Plaintiff's doctors would not say that he was "disabled." It goes on to state that Alexander conversed with Reilly who told her to "talk to [Plaintiff's attorney] about finding a [doctor] who will say what he wants." (*Id.*)

This last statement is curious. On one hand, it could support an inference that Reilly was frustrated with what he believed were Plaintiff's ever changing positions. On the other hand, it could reasonably be read to infer that Reilly's desire to facilitate Plaintiff's receipt of disability benefits was preferred to his reinstatement as a police officer. Thus, Reilly may be deemed to have been motivated as much by retaliation as by magnanimity. Such dueling inferences, of course, favor Plaintiff at summary judgment. *See Ahern v. O'Donnell*, 109 F.3d 809, 811 (1st Cir.1997) (at summary judgment "all reasonable competing inferences" must be drawn in favor of the non-moving party).

Alexander's letter dated November 22, 1994, (Plaintiff's Exhibits, Exhibit 46), provides more evidence of possible retaliation by Reilly. As previously indicated, this letter, addressed to Plaintiff's counsel with a copy to Reilly, states as follows: "[A]s you recall from our telephone conversation in July, we had requested [Dr. Bird] hold off on his report to the City until after the possibility of a disability retirement was fully explored by [Plaintiff]." (*Id.*) In Plaintiff's view, Alexander's statement "was inaccurate ... [as] Dr. Bird had in fact issued his report that [Plaintiff] was qualified to return to work on or about July 5, 1994" and was, therefore, made "to

intentionally mislead [Plaintiff] and his attorneys." (Plaintiff's Facts ¶ ooooo.)

Assuming that Alexander's letter was in fact inaccurate and intended to deceive, a point she vehemently disputes, it may be reasonably inferred that the letter arose out of Alexander's November 14th meeting with Reilly. While there is no direct evidence that Reilly knew about Dr. Bird's July 5, 1994 report, Plaintiff's recent visit with Dr. Bird and that visit's relationship to Plaintiff's potential claim for disability were discussed by Reilly and Alexander on November 14th. Yet other evidence indicates that Alexander had instructed Dr. Bird "to keep the report confidential." (Plaintiff's Exhibits, Exhibit 5 (Bird Deposition) at 109.)

To be sure, had Reilly been motivated to conceal Dr. Bird's report solely to assist Plaintiff in obtaining disability benefits as may have been his inclination, the claim of retaliation might ultimately fail. For now, however, to the extent that the court finds it reasonable for summary judgment purposes to infer that Reilly's actions impeded or in any way contributed to the delay in reinstating Plaintiff, he too may have been motived in part by retaliation.

#### (5) Pittsfield

Having analyzed the individual defendants, the court must still consider whether the municipal defendant, Pittsfield, might be said to have engaged in retaliation. In doing so, the court must determine whether Plaintiff has properly alleged that Pittsfield retaliated against Plaintiff via an official "policy or custom."

For Plaintiff to maintain the retaliation component of Count II against Pittsfield, he must allege that his civil rights were violated as the result of an official "policy or custom." *See Monell*, 436 U.S. at 694, 98 S.Ct. 2018. The showing is twofold. First, Plaintiff "must identify a mu-

nicipal 'policy' or a 'custom' that caused [his] injury." *Silva v. Worden,* 130 F.3d 26, 30–31 (1st Cir.1997) (citing *Board of County Comm'rs of Bryan County v. Brown,* 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997); *Pembaur v. Cincinnati,* 475 U.S. 469, 479–81, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); *Monell,* 436 U.S. at 694, 98 S.Ct. 2018). Second, the disputed "policy" or "custom" must "be the cause and moving force behind the deprivation of constitutional rights." *Silva,* 130 F.3d at 31 (citing *Bryan County Comm'rs,* 520 U.S. at 404, 117 S.Ct. 1382).

▬▬▬ There are at least two methods by which a municipality may be held liable for acts taken pursuant to a policy: "when the deprivation resulted (1) 'from the decisions of its duly constituted legislative body', or (2) from the decisions 'of those officials whose acts may fairly be said to be those of the municipality.'" *Id.* (quoting *Bryan County Comm'rs,* 520 U.S. at 403–04, 117 S.Ct. 1382) (footnote omitted). In such "policy" cases, "[m]unicipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Pembaur,* 475 U.S. at 481, 106 S.Ct. 1292. Alternatively, a municipality may be liable to a plaintiff who is injured by "an act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker [when] the relevant practice is so widespread as to have the force of law." *Bryan County Comm'rs,* 520 U.S. at 404, 117 S.Ct. 1382.

Plaintiff does not argue that either a municipal "custom" or the actions of Pittsfield's constituted legislative body are at play. As a result, the court, like the parties, will focus on the second part of the

"policy" issue, i.e., whether the alleged retaliation resulted from the decisions of an official—Plaintiff points to Reilly—whose acts may fairly be said to be those of Pittsfield. In other words, the pertinent question is whether Reilly possessed "final authority to establish municipal policy with respect to the action ordered." *Pembaur,* 475 U.S. at 481, 106 S.Ct. 1292. The answer to this question is yes. In Reilly's own words, "the ultimate decision" with respect to Plaintiff's disqualification "would be the mayor['s]" since he "ha[d] to make the final appointment." (Plaintiff's Exhibits, Exhibit 2) (Reilly Deposition at 35–36.) *Compare Silva,* 130 F.3d at 31 (actions of individual who was not delegated final decision making authority with respect to plaintiff's complaint cannot form basis of municipal "policy"). The court thus turns to the causation issue.[16]

As indicated, the disputed policy must also be the cause of the injury. *See Silva,* 130 F.3d at 30. In the words of the Supreme Court, "it is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Board of County Comm'rs,* 520 U.S. at 404, 117 S.Ct. 1382 (emphasis in original). Stated another way, "a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.*

In his memorandum of law, Plaintiff argues that Reilly's actions provide the causal link, arguing, in part, as follows:

---

**16.** It is arguable that Alexander, City Solicitor, also possessed final decision making authority as she signed the Settlement Agreement on Pittsfield's behalf. (See Pittsfield's Exhibits, Exhibit B.) However, since Plaintiff focuses on Reilly as the "official" causal link, the court does likewise.

Reilly was ... involved in the decision-making to encourage [Plaintiff] to seek out disability [retirement options] even though Reilly knew [Plaintiff] was qualified to work. Additionally, Reilly was ... the person who had to make the ultimate decision as to whether [Plaintiff] had sufficiently divested himself from his taxi business. From these facts[,] ... it can reasonably be inferred that Reilly was responsible for the ultimate decision-making that kept [Plaintiff] ... from returning to work....

. . . . .

... Reilly's decision to not reinstate [Plaintiff], as well as his decision to not disqualify [Plaintiff] certainly can reasonably be inferred to constitute municipal policy. *It also can be reasonably ... inferred that [Reilly's] specific actions were a direct cause of the discrimination and retaliation that [Plaintiff] suffered.* The defendant City of Pittsfield should thus be liable for its actions through the Mayor.

(Plaintiff's Brief at 4–5, 6 (emphasis added).) In support of his causation argument, Plaintiff cites three handwritten notes and a letter from Alexander. (See *id.* at 4–5.) [17]

The first handwritten note is dated November 10, 1993, the very day Plaintiff received a positive panel test for hepatitis C. (Plaintiff's Exhibits, Exhibit 11.) The note makes absolutely no reference to Reilly. At best, the note indicates that a decision was made to send Plaintiff to a specialist and mentions "guidelines for public safety." (*Id.*) The court is at a loss to see how the note raises a legitimate inference of, let alone demonstrates, "a direct causal link between" Pittsfield and the alleged deprivation of Plaintiff's rights.

Alexander's second note, dated May 11, 1994, (Plaintiff's Exhibits, Exhibit 27), is more troublesome. The note appears to indicate that Reilly met with Alexander and Lee a few days after the results of Plaintiff's liver biopsy were released. It also cryptically refers to "results of biopsy," "enforcing [the] ADA" and the "2 job rule" as well as Plaintiff's anticipated return to work. (*Id.*) It is difficult to infer from the note, considered in isolation, that Pittsfield or Reilly were the moving force behind any injury alleged.

As previously indicated, however, Alexander's third note of November 14, 1994, (Plaintiff's Exhibits, Exhibit 62), together with her subsequent letter of November 22, 1994, (Plaintiff's Exhibits, Exhibit 46), provide the foundation for the causal link. In the court's view, it is reasonable to infer from these documents, perhaps with other evidence, that Pittsfield, through Reilly, was the official "moving force" behind any injury allegedly suffered by Plaintiff. Stated another way, to the extent that the evidence can be reasonably read to infer that Reilly's—and hence Pittsfield's—actions were taken with the requisite degree of culpability, i.e., to retaliate against Plaintiff, then Plaintiff has overcome, for summary judgment purposes, the causation component of *Monell*'s "policy" requirement.

(B) Defendants' burden

With regard to the final element of Plaintiff's section 1983 retaliation claim, Alexander, Reilly and Pittsfield, the only defendants remaining on this claim, have not shown as of yet that they would have delayed or impeded Plaintiff's reinstate-

---

17. Plaintiff also cites several lines from Alexander's deposition testimony which simply appear to confirm her understanding that Reilly was the ultimate decisionmaker with regard to Plaintiff's appointment.

ment "even in the absence of the protected conduct." *Mount Healthy*, 429 U.S. at 287, 97 S.Ct. 568. If any of these defendants is able to make such a showing at trial, the trial court would be justified, in this court's view, to enter judgment in that defendant's favor on Plaintiff's section 1983 retaliation cause of action. At present, however, this court will recommend that Alexander, Reilly and Pittsfield's motions with respect to that portion of Count II alleging section 1983 retaliation be denied.

(ii) Section 1981 retaliation

■ No party has cited any decision from this circuit discussing retaliation in the context of section 1981. In fact, only Plaintiff and Pittsfield address retaliation in any depth. Accordingly, since the issue of whether a section 1981 retaliation claim even exists appears to be yet another question of first impression in this circuit, much of the legal discussion is borrowed from other jurisdictions. The court's analysis is complicated by the fact that the law in this area too has changed significantly in the past dozen years.

In the late 1980's, prior to passage of the Civil Rights Act of 1991, section 1981 provided only that "[a]ll persons ... shall have the same right in every State and Territory to make and enforce contracts ... as is enjoyed by white citizens." 42 U.S.C. § 1981(a). Before 1989, courts interpreting the "make and enforce contracts" language held that section 1981 encompassed claims for race-based retaliation during the contract. *See Andrews v. Lakeshore Rehabilitation Hosp.*, 140 F.3d 1405, 1410 (11th Cir.1998) (citing cases). In 1989, however, the Supreme Court in *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132

(1989), held that the "make and enforce contracts" language covered "only conduct at the initial formation of the contract and conduct which impairs the right to enforce contract obligations through legal process," but not "conduct which occurs after the formation of a contract and which does not interfere with the right to enforce established contract obligations." *Patterson*, 491 U.S. at 171, 179, 109 S.Ct. 2363.

In partial response to *Patterson*, Congress enacted the Civil Rights Act of 1991 which, via the new subsection (b) (see supra at n.7), more broadly defined the phrase "make and enforce contracts." Thus, that phrase was amended to "include[ ] the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). In *Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 114 S.Ct. 1510, 128 L.Ed.2d 274 (1994), the Supreme Court described "the 1991 Act's function as *'expanding* the scope of relevant civil rights statutes in order to provide adequate protection to victims of discrimination.'" *Rivers*, 511 U.S. at 308, 114 S.Ct. 1510 (quoting Pub.L. No. 102–166 § 3(4), 1095 Stat. 1071 § 3(4) (1991) (emphasis added by Supreme Court)). *See also Andrews*, 140 F.3d at 1411 (noting that the 1991 Act's legislative history is "replete with expressions of Congress's intent to broaden section 1981 specifically to cover race-based retaliation in all phases of contractual relations").

Where does that bring us here? Given the currently broad language of the "make and enforce contracts" language of section 1981, it is clear that Plaintiff is not precluded from bringing a section 1981 retaliation claim.[18] Plaintiff's 1981 retalia-

---

18. To the extent that *Butler v. RMS Technologies, Inc.*, 741 F.Supp. 1008, 1010 (D.Mass.

1990), might hold otherwise, that case is out-

tion claim revolves around his contractual relationship with Pittsfield, specifically, the allegation that Plaintiff suffered adverse actions—delays and interference—in the implementation of the Settlement Agreement. (See Complaint ¶ 39.) Whether Plaintiff can survive summary judgment on this cause of action, however, is another matter.

The parties agree that section 1981 retaliation must be analyzed under the *McDonnell Douglas* paradigm for Title VII claims. (See, e.g., Docket No. 59): Defendant City of Pittsfield's Memorandum in Support of its Motion for Summary Judgment ("Pittsfield's Brief") at 11 (citing *Choudhury v. Polytechnic Institute of New York*, 735 F.2d 38, 44 (2nd Cir.1984); *Goff v. Continental Oil Co.*, 678 F.2d 593, 599 (5th Cir.1982); *Sisco v. J.S. Alberici Constr. Co.*, 655 F.2d 146, 150 (8th Cir. 1981)); Plaintiff's Brief at 19 (citing *Wyatt v. Boston*, 35 F.3d 13, 15 (1st Cir.1994); *Petitti v. Comm'n of Mass. Dep't of Mental Health*, 859 F.Supp. 33, 40 (D.Mass. 1993)). *See also Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 190–91 (4th Cir.2001) (utilizing *McDonnell Douglas* three-stage burden-shifting framework in section 1981 retaliation action). The parties also appear to agree that, to make a prima facie case of retaliation under section 1981. Plaintiff must demonstrate (1) that he engaged in activities protected by section 1981; (2) that he was subjected to an adverse employment action; and (3) that there is a causal connection between the two. (See Pittsfield's Brief at 11; Plaintiff's Brief at 19.)

Several individual defendants imply that Plaintiff cannot made out a prima facie case of retaliation against them as they are not Plaintiff's "employer." Again, were this a Title VII case, these defendants probably would be correct. *See Sauers*, 1

F.3d at 1125; *Horney*, 95 F.Supp.2d at 33–36. However, as indicated, even though Title VII cases appear to provide the analytical framework, section 1981 liability can attach to an individual as well as to an employer. *See Allen*, 928 F.2d at 983; *Johnson*, 843 F.Supp. at 978. Hence, the court has considered section 1981 retaliation liability with respect to each of the defendants and its conclusion mirrors its analysis of section 1983 retaliation.

In the end, the court believes, for essentially the same reasons stated above with respect to Section 1983 retaliation, that no reasonable jury could infer that Dr. Bird or Lee retaliated against Plaintiff because he engaged in a protected activity. On the other hand, the court believes that a reasonable jury could infer that Alexander and Reilly retaliated against Plaintiff in violation of section 1981 and that, through Reilly, Pittsfield may be liable for having an official "policy" of retaliation which caused the alleged injury. The court, therefore, will recommend that summary judgment only enter in favor of Dr. Bird and Lee on that portion of Count I alleging section 1981 retaliation.

### (iii) Qualified immunity

Before leaving sections 1981 and 1983, one final matter needs to be addressed with respect to Alexander, Reilly and Pittsfield, the only defendants this court believes are not entitled to summary judgment on Counts I and II. Citing *Iacobucci v. Boulter*, 193 F.3d 14, 24 (1st Cir.1999), Alexander states, quite conclusory, that "[a]s the undisputed facts make plain, [she] had an objectively reasonable basis for believing her conduct would not abridge [Plaintiff]'s rights." (Alexander's Brief at 31.) Pittsfield, too, has a perfunctory qualified immunity argument. (See Pitts-

dated; it was decided after *Patterson* but be- fore enactment of the Civil Rights Act of 1991.

field's Brief at 4–5.) Reilly's qualified immunity argument is described in somewhat greater depth.

▬▬▬ Assuming Alexander's and Pittsfield's passing qualified immunity arguments have not been waived, *cf. Airport Impact Relief, Inc. v. Wykle*, 192 F.3d 197, 205 (1st Cir.1999) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived ...."), they, along with Reilly's, must still fail at this juncture. As to Reilly and Alexander, it is well-settled in this circuit that, when there is a triable issue as to whether an official acted with a retaliatory motive, a grant of qualified immunity at the summary judgment stage is inappropriate. *See Broderick v. Roache*, 996 F.2d 1294, 1298 (1st Cir.1993); *Feliciano–Angulo v. Rivera–Cruz*, 858 F.2d 40, 47 (1st Cir.1988). As to Pittsfield, its argument ought to be reject-

ed as well. "A municipality enjoys no immunity from damages liability under § 1983." *Fletcher v. Town of Clinton*, 196 F.3d 41, 55 (1st Cir.1999) (citing *Owen v. City of Independence*, 445 U.S. 622, 657, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980)). In other words, it is possible "for a municipality to be held liable for the actions of lower-level officers who are themselves entitled to qualified immunity." *Id.* (citation and internal quotation marks omitted).

## B. CONSPIRACY (COUNT IV)

Plaintiff's conspiracy claim is brought under two theories. First, Plaintiff alleges that the individual defendants engaged in a "discriminatory" conspiracy in violation of 42 U.S.C. § 1985(3).[19] Second, Plaintiff contends the individual defendants engaged in a "retaliatory" conspiracy in violation of 42 U.S.C. § 1985(2).[20] Several

---

19. In full, section 1985(3) states as follows:

If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exer-

cising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3).

20. In full, section 1985(2) states as follows:

If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified, or to influence the verdict, presentment, or indictment of any grand or petit juror in any such court, or to injure such juror in his person or property on account of any verdict, presentment, or indictment lawfully assented to by him, or of his being or having been such juror; or if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the

defendants suggest that Plaintiff may also be alleging a "common law" conspiracy. However, because Plaintiff's memorandum of law does not mention such a theory, the court will not consider it further.[21]

### 1. Section 1985(3) "Discriminatory" Conspiracy

A conspiracy cause of action under 42 U.S.C. § 1985(3) has four elements: "(1) two or more persons must conspire, (2) to deprive, either directly or indirectly, any person or class of persons of the equal protection of the laws or of equal privileges and immunities under the laws, (3) one or more of the conspirators must have done or caused to be done an act in furtherance of the object of the conspiracy, and (4) the plaintiff must have suffered either an injury to person or property or a deprivation of a constitutionally protected right or privilege as a result of the conspiracy." *Andrade v. Jamestown Housing Auth.*, 82 F.3d 1179, 1192 (1st Cir.1996). "The Supreme Court has construed the second element to require that 'there must be some racial or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action.'" *Id.* (quoting *Griffin v. Breckenridge*, 403 U.S. 88, 102, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971)).

As indicated above, the court believes that Plaintiff has failed to show any discriminatory or racial animus toward him on the part of any individual defendant. At best, Plaintiff might *believe* that Alexander was acting pursuant to a discriminatory or class-based animus. (See Alexander's Brief, Exhibit 5 (Powell Deposition) at 271–79.) However, one actor does not a section 1985(3) conspiracy make. *See Irizarry v. Palm Springs Gen. Hosp.*, 657 F.Supp. 739, 741 (S.D.Fla.1986) (citing *Francis–Sobel v. Univ. of Me.*, 597 F.2d 15, 17 (1st Cir.1979)); BLACK'S LAW DICTIONARY at 305 (7th ed.1999) ("conspiracy" defined as "[a]n agreement between *two or more persons* to commit an unlawful act") (emphasis added). Moreover, the court has found no reasonable inference that unlawful discrimination was a determining factor in Alexander's actions. Thus, Plaintiff's section 1985(3) conspiracy claim must fail.[22]

### 2. Section 1985(2) "Retaliatory" Conspiracy

In his memorandum of law, Plaintiff alleges that he is also asserting a sec-

---

equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws.
42 U.S.C. § 1985(2).

21. Nor has the court considered further any argument that sections 1985(3) and 1985(2) do not contain private rights of action. That argument is misplaced. *See Nieves v. McSweeney*, 241 F.3d 46 (1st Cir.2001) (indicating that section 1985(3) "confers a private right of action for injuries occasioned when 'two or more persons . . . conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws' "); *Alt-*

*schuler v. Univ. of Pa. Law Sch.*, No. 95 Civ. 249, 1997 WL 129394, at *17 (S.D.N.Y.1997) ("Section 1985(2) provides a private right of action to recover for damages from certain kinds of interference with federal and state judicial proceedings.") (citing *Kush v. Rutledge*, 460 U.S. 719, 724, 103 S.Ct. 1483, 75 L.Ed.2d 413 (1983)), *aff'd*, 201 F.3d 430 (2nd Cir.1999) (unpublished), *cert. denied*, 530 U.S. 1276, 120 S.Ct. 2744, 147 L.Ed.2d 1008 (2000).

22. In so concluding, the court recognizes that there may be additional reasons why Plaintiff's section 1985(3) conspiracy claim fails. (See, e.g., Lee's Brief at 14–15) (arguing that Plaintiff's section 1985(3) cause of action is "preempted" by both section 1983 and Title VII.)

tion 1985(2) conspiracy against the individual defendants. (Plaintiff's Brief at 25–26.) Plaintiff describes his section 1985(2) claim as a conspiracy of "retaliation." As previously explained, it is reasonable to infer that Alexander and Reilly, but not the other individual defendants, may have been motivated by unlawful retaliation. However, neither Alexander nor Reilly discusses section 1985(2), perhaps because the First Circuit has interpreted this section as providing a remedy for a plaintiff who has been retaliated against for having instituted a prior lawsuit. *See Irizarry v. Quiros,* 722 F.2d 869, 871 (1st Cir.1983). *See also Wright v. No Skiter Inc.,* 774 F.2d 422, 426 (10th Cir.1985) (similar). Furthermore, because the Supreme Court has held that class-based discrimination is not a necessary element of a section 1985(2) claim, *see Kush,* 460 U.S. at 721, 103 S.Ct. 1483, the lack of discriminatory animus does not doom this cause of action. At bottom, the court believes that Count IV should survive, but only insofar as it targets Alexander and Reilly as engaging in a conspiracy in violation of 42 U.S.C. § 1985(2).

## C. *THE REHAB ACT (COUNT III)*

The Rehab Act bars certain discrimination against individuals with disabilities. It states, in pertinent part, as follows:

No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .

29 U.S.C. § 794(a). The phrase "individual with a disability" means "any person who—(i) has a physical or mental impairment which substantially limits one or more of such person's major life activities; (ii) has a record of such an impairment; or (iii) is regarded as having such an impairment." 29 U.S.C. § 705(20)(B). The phrase, however, "does not include an individual who has a currently contagious disease or infection and who, by reason of such disease or infection, would constitute a direct threat to the health or safety of other individuals or who, by reason of the currently contagious disease or infection, is unable to perform the duties of the job." 29 U.S.C. § 705(20)(D).

Pittsfield, the only remaining defendant on the Rehab Act count, pursues a two-fold argument. First, Pittsfield asserts that Plaintiff's hepatitis C is not an impairment that substantially limits one or more of his major life activities and that, in any case, it did not regard Plaintiff as having such an impairment. 29 U.S.C. § 705(20)(B)(i) and (iii). Second, Pittsfield contends that Plaintiff's hepatitis C is a "contagious disease or infection" which they reasonably believed "constitute[d] a direct threat to the health or safety of other individuals." 29 U.S.C. § 705(20)(D). Case law in this area, too, has evolved rapidly over the past several years.

1. *Does Plaintiff's Hepatitis C Substantially Limit One or More of His* Major *Life Activities or did Pittsfield Regard Him to Have Such an Impairment?*

 Pittsfield acknowledges that hepatitis C is a physical impairment, but argues that it does not substantially limit a major life activity. Citing federal labor regulations, Pittsfield asserts "major life activities" are limited to "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking breathing, learning and working." 29 C.F.R. § 1630.2(h)(2)(i). As a riposte, Plaintiff argues that hepatitis C substantially limits

the major life activity of reproduction. Neither side offers any medical evidence in support of their claims.

The court need not resolve the issue of whether Plaintiff's hepatitis C *in fact* substantially limits a major life activity, since, at the very least, there is a genuine issue as to whether Pittsfield *regarded* Plaintiff as having an impairment which substantially limits his ability to work. 29 U.S.C. § 705(20)(B)(iii). *See Tardie v. Rehabilitation Hosp. of Rhode Island,* 168 F.3d 538, 541 (1st Cir.1999) ("An individual who has an impairment that is not substantially limiting (or has no impairment at all) is nevertheless 'disabled' if she is treated by her employer as having an impairment that does substantially limit major life activities."). For example, on December 21, 1993, Dr. Bird sent a report to Pittsfield's personnel department indicating that Plaintiff had "chronic active hepatitis" and was, therefore, "disqualified" from employment. Then, in June of 1994, Dr. Bird consulted with public health officials at the U.S. Center for Disease Control and the University of Massachusetts Medical Center because of his concern that the nature of Plaintiff's employment as a police officer entailed a higher than normal risk of blood to blood contact. Even Pittsfield, in its memorandum of law, implies that there is some evidence that it treated him as having a substantially limiting impairment. (Pittsfield's Brief at 15 (Because Plaintiff "cannot prove that Hepatitis C is a physical impairment, which limits a major life activity, nor will he be able to show that he has a record of such an impairment[,] ... [Plaintiff] is thus left to prove that [Pittsfield], because of his affliction with Hepatitis C, *incorrectly regarded* his disease as a

threat to public health ....") (emphasis added).)

In short, Pittsfield's first argument does not entitle it to summary judgment on Count III. Accordingly, the court turns to Pittsfield's second argument that Plaintiff's hepatitis C is a "contagious disease of infection" that it reasonably believed constituted a "direct threat" to others.

> 2. *Is Hepatitis C a Contagious Disease or Infection Constituting a Direct Threat to the Health or Safety of Other Individuals?*

▆▆▆ Citing tuberculosis and HIV/AIDS cases, Pittsfield argues that hepatitis C is a contagious disease and that the city believed "in good faith" that police officers with hepatitis C posed a direct threat to public health. (Pittsfield's Brief at 15.) In response, Plaintiff argues that Pittsfield's belief was unreasonable. The court believes that genuine issues of material fact preclude summary judgment.

▆▆▆ The "direct threat" restriction adopts the Supreme Court's interpretation of the Rehab Act in *School Bd. of Nassau County v. Arline,* 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987). *Bragdon v. Abbott,* 524 U.S. 624, 649, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998).[23] Under *Arline,* the "basic factors" for determining if a carrier of a contagious disease is entitled to protection include "[findings of] facts, based on reasonable medical judgments given the state of medical knowledge, about (a) the nature of the risk (how the disease is transmitted), (b) the duration of the risk (how long is the carrier infectious), (c) the severity of the risk (what is the potential harm to third parties) and (d) the probabilities the disease will be trans-

---

**23.** While *Bragdon* and other cases cited in this section concerned suits under both the Rehab Act and the ADA, the two acts' standards for carriers of contagious diseases are the same. *See Onishea v. Hopper,* 171 F.3d 1289, 1298 n. 14 (11th Cir.1999); *Estate of Mauro ex rel. Mauro v. Borgess Med. Ctr.,* 137 F.3d 398, 402 (6th Cir.1998).

mitted and will cause varying degrees of harm." *Arline*, 480 U.S. at 287–88, 107 S.Ct. 1123.

*Bragdon* involved a disability discrimination claim brought in this circuit by an HIV-positive individual against a dentist who refused to fill the plaintiff's cavity. The First Circuit affirmed the grant of summary judgment *to the plaintiff, Abbott v. Bragdon*, 107 F.3d 934 (1st Cir.1997), and, after a remand was ordered by the Supreme Court, *Bragdon v. Abbott*, 524 U.S. 624, 118 S.Ct. 2196, 141 L.Ed.2d 540, reaffirmed that decision, *Abbott v. Bragdon*, 163 F.3d 87, 88 (1st Cir.1998). The sole remaining question on remand was whether performance of the cavity-filling procedure posed a "direct threat" to others and, thereby, came within the exception to the ADA's broad prohibition against discrimination. *Abbott*, 163 F.3d at 88. The First Circuit resolved that question, as a matter of law, in favor of the plaintiff. *Id.* at 90. It did so, even though there were forty-two documented cases of occupational transmission of HIV to health-care workers, none of whom were dental workers. *Id.*

In the instant case, Pittsfield provides no facts about the nature of the risk of hepatitis C, the duration of the risk, the potential harm to third parties or the probabilities that hepatitis C will be transmitted and cause varying degrees of harm. Of course, Pittsfield points out that Dr. Bird considered standards and guidelines about hepatitis C and that the city has a general duty to keep its employees free from the risk of contagious disease. These facts, however, simply do not *demonstrate* that Pittsfield is entitled to judgment as a matter of law on the question of whether Plaintiff's hepatitis C caused a "direct threat" to the health and safety of other individuals. Rather, at the very least, a genuine issue of material fact exists in this regard. *See Nunes v. Wal–Mart Stores, Inc.*, 164 F.3d 1243, 1249 (9th Cir.1999) (reversing summary judgment for employer where plaintiff raised issue of material fact as to "direct threat" question); *Rizzo v. Children's World Learning Centers, Inc.*, 84 F.3d 758, 764 (5th Cir.1996) (issues of material fact existed as to whether plaintiff was direct threat to health or safety of others when driving van carrying small children, so as to be precluded from being qualified individual with disability). Moreover, Pittsfield's arguments to the contrary, the "direct threat" exception says nothing about an employer's "good faith" or "reasonable belief" that the plaintiff's condition causes a risk to the community. *See* 29 U.S.C. § 705(20)(D).[24] Accordingly, the court will recommend that Pittsfield's motion for summary judgment with respect to Count III be denied.

## D. *BREACH OF CONTRACT (COUNT V)*

As indicated, the only remaining defendant with respect to Plaintiff's breach of contract claim—which alleges breach of the Settlement Agreement—is Pittsfield. Resolution of this claim is easy. In its motion as well as at oral argument, Pittsfield acknowledged that it was not seeking summary judgment on Plaintiff's breach of contract claim. The court, therefore, will recommend that only the individual defendants, but not Pittsfield, be granted summary judgment on Count V.

---

**24.** Even if the statute so stated, the argument against granting summary judgment would still be strong. *See Garcia–Ayala v. Lederle Parenterals, Inc.*, 212 F.3d 638, 652 (1st Cir. 2000) (O'Toole, J., dissenting) ("Where many interrelated considerations bear on an assessment of what is 'reasonable,' prudence cautions against too ready a resort to summary dispositions as a matter of law.").

## IV. CONCLUSION

For the foregoing reasons, the court recommends that Defendants' various motions for summary judgment be resolved as follows:

(1) Dr. Bird and Lee's motions for summary judgment (Docket Nos. 46 and 49) should be ALLOWED in full;

(2) Alexander and Reilly's motions for summary judgment (Docket Nos. 56 and 61) should be DENIED with respect to Counts I and II (insofar as those counts assert claims of retaliation) and Count IV (insofar as that court asserts a claim under 42 U.S.C. § 1985(2)), but otherwise ALLOWED; and

(3) Pittsfield's motion for summary judgment (Docket No. 57) should be DENIED with respect to Counts I and II (insofar as those counts assert claims of retaliation), Count III and Count V, but otherwise ALLOWED.[25]

March 19, 2001.

---

**25.** The parties are advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to these findings and recommendations must file a written objection with the Clerk of this Court within ten (10) days of the party's receipt of this Report and Recommendation. The written objection must specifically identify the portion of the proposed findings or recommendations to which objection is made and the basis for such objection. The parties are further advised that failure to comply with this rule shall preclude further appellate review by the Court of Appeals of the District Court order entered pursuant to this Report and Recommendation. *See Keating v. Secretary of Health & Human Services,* 848 F.2d 271, 275 (1st Cir.1988); *United States v. Valencia–Copete,* 792 F.2d 4, 6 (1st Cir.1986); *Scott v. Schweiker,* 702 F.2d 13, 14 (1st Cir.1983); *United States v. Vega,* 678 F.2d 376, 378–379 (1st Cir.1982); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603, 604 (1st Cir.1980). *See also Thomas v. Arn,* 474 U.S. 140, 154–55, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985). A party may respond to another party's objections within ten (10) days after being served with a copy thereof.